Filed 4/27/26  P. v. Teneng CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MOFFAT OTHNIEL TENENG,<br><br>Defendant and Appellant. | F088048<br><br>(Super. Ct. No. 19CR-01573)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  James W. Hollman, Judge.  (Retired Judge of the Tulare Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Erin J. Radekin for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In 2019, defendant Moffat Othniel Teneng was charged with the attempted robbery of two minors, felony child abuse, and infliction of corporal injury for stabbing one minor, with enhancements for personal use of a deadly weapon and personal infliction of great bodily injury (GBI). Defense counsel indicated his maximum possible sentence was 10 years six months in prison.

Defendant entered into a negotiated disposition in 2019, and pled no contest to an amended count of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)) and admitted an enhancement for personal infliction of great bodily injury on one victim (§ 12022.7, subd. (a)), for an aggregate sentence of five years and dismissal of the other charges.

Defendant is a native and citizen of Cameroon. He entered the United States as a minor and his status was adjusted to lawful permanent resident in 2014, when he was 17 years old. "The Immigration and Nationality Act (INA) [citation], provides that a noncitizen who has been convicted of an 'aggravated felony' may be deported from this country." (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187.) The noncitizen also is "ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to remain in the country. [Citations.] Accordingly, removal is a virtual certainty for [the noncitizen] found to have an aggravated felony conviction, no matter how long he has previously resided here." (*Sessions v. Dimaya* (2018) 584 U.S. 148, 153; see *Torres v. Lynch* (2016) 578 U.S. 452, 454–455.)

At the time of his plea, a conviction for violating section 245, subdivision (a)(1), assault with a deadly weapon, was a "crime of violence," which qualified as an "aggravated felony" if the "term of imprisonment" ordered is at least one year. (*People v. Carrillo* (2024) 101 Cal.App.5th 1, 15 (*Carrillo*); *People v. Villalba* (2023) 89

---

[1] All further statutory citations are to the Penal Code unless otherwise noted.

2.

Cal.App.5th 659, 667 (*Villalba*); *U.S. v. Vasquez-Gonzalez* (9th Cir. 2018) 901 F.3d 1060, 1063–1064; *U.S. v. Jimenez-Arzate* (9th Cir. 2015) 781 F.3d 1062, 1063–1064; *U.S. v. Grajeda* (9th Cir. 2009) 581 F.3d 1186, 1196–1197; *U.S. v. Heron-Salinas* (9th Cir. 2009) 566 F.3d 898, 898–899.)[2]

When he entered his plea, defendant signed a felony advisement and waiver of rights form, and initialed the following advisement consistent with section 1016.5, subdivision (a): "I understand that if I am not a citizen, my guilty or no contest plea *will result* in my deportation (removal), exclusion from admission to the United States, and denial of naturalization."[3] (Italics added.) At the plea hearing, defense counsel stated that he had consulted with an experienced immigration attorney about the impact of the plea on defendant's status, he "th[o]roughly advised" defendant that he "should have grave concerns about potential deportation as a result of this plea," and defendant wanted to proceed with the plea. In response to the trial court's questions, defendant acknowledged he received this immigration advice from counsel, he understood the advice, and he still wanted to enter his plea.

In November 2023, defendant was serving his sentence in the Department of Corrections and Rehabilitation (CDCR), when he was taken into custody by the United States Department of Homeland Security (DHS), moved to a federal Immigrations and

---

[2] Cf. *U.S. v. Gomez* (9th Cir. 2026) 165 F.4th 1199, 1210.

[3] As will be discussed in parts I. and II. below, section 1016.5, subdivision (a) states that prior to the acceptance of a plea of guilty or no contest, the trial court "shall administer" the following advisement to the defendant: "If you are not a citizen of the United States, you are hereby advised that conviction of the offense for which you have been charged *may have* the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (Italics added.) (See *People v. Martinez* (2013) 57 Cal.4th 555, 558 (*Martinez*).) A validly executed waiver form is a proper substitute for verbal admonishment by the court of the section 1016.5 advisement. (*People v. Ramirez* (1999) 71 Cal.App.4th 519, 521–523 (*Ramirez*).)

Customs Enforcement (ICE) detention facility, and served with notice that removal (deportation) proceedings were being initiated because he was convicted of assault with a deadly weapon, an aggravated felony.

Defendant filed in the trial court "a common law nonstatutory motion to vacate" his plea and conviction, "grounded in the Court's inherent authority to protect against constitutional violations occurring before it." Defendant asserted the court failed to advise him of the immigration consequences of his plea as required by section 1016.5. He also argued defense counsel was prejudicially ineffective because he allegedly failed to advise him of the immigration consequences of his plea, failed to negotiate an immigration-neutral disposition, and failed to advise him that there were alternate dispositions that would not result in his deportation. In raising these issues, defendant expressly stated he was still in custody and ineligible to seek relief pursuant to section 1473.7, subdivision (a)(1).[4]

The trial court conducted an evidentiary hearing on his motion. Defendant's defense counsel testified he spoke with defendant and defendant's father about his immigration status, the district attorney made a plea offer for assault with a deadly weapon with the great bodily injury enhancement and would not offer a more favorable disposition, counsel consulted with an immigration expert, and counsel "made it pretty

---

[4] As will be discussed in parts I. and III., *post*, section 1473.7, subdivision (a)(1) allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is "legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (*Ibid.*; see § 1473.7, subd. (f)(1).) A person in actual custody, or constructive custody while on probation or parole from his or her criminal conviction, is ineligible to obtain relief under section 1473.7. (*People v. Villa* (2009) 45 Cal.4th 1063, 1069; *People v. DeJesus* (2019) 37 Cal.App.5th 1124, 1130–1131; *People v. Cruz-Lopez* (2018) 27 Cal.App.5th 212, 220–221 (*Cruz-Lopez*).)

clear" to defendant that if he accepted the plea offer, "he would almost certainly get deported," and he still accepted the plea offer.

The trial court denied defendant's motion to vacate and found he understood the immigration consequences of his plea based on the advice of his defense counsel. The court rejected the credibility of defendant's contrary declaration that he did not understand the immigration consequences.

On appeal, defendant asserts the trial court should have granted his motion to withdraw his plea, and restates the arguments raised below as to section 1016.5 and counsel's alleged failure to advise about the immigration consequences and negotiate for an immigration-neutral plea. Defendant further asserts that while he filed "a common law nonstatutory motion to vacate" his plea and conviction, this court should review his motion pursuant to the provisions of section 1473.7, subdivision (a)(1), because the trial court effectively considered his motion under that statute. Defendant argues the record shows he did not meaningfully understand the immigration consequences of his plea, and his error was prejudicial because there was a reasonable probability that he would have rejected the plea offer if he had correctly understood the actual or potential immigration consequences of his plea, or been advised there were immigration-neutral pleas available to him. (See, e.g., *People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).)

The People have not contested defendant's argument that the denial of his motion should be reviewed under section 1473.7, subdivision (a)(1). The People assert the testimony of trial counsel at the evidentiary hearing rebutted defendant's limited declaration and proved defendant was fully advised he faced deportation as a result of his plea, he understood these advisements, and defense counsel made appropriate efforts to obtain an immigration-neutral plea.

After conducting independent review, we affirm the trial court's denial of defendant's motion to vacate.

# FACTS

On March 24, 2019, L.S., who was 12 years old, and P.H., who was 15 years old, rode their bicycles to the skate park in Atwater. It was around 9:30 p.m., and no one else was around. They ran up and down the ramps.[5]

While they were playing, a man confronted them with a knife and demanded their wallets. L.S. and P.H. were the only witnesses who testified at the preliminary hearing, and each positively identified defendant as the suspect who confronted them.

**L.S.'s Testimony**

L.S. testified he was sitting with P.H. at the bottom of a skate ramp when defendant walked past them. He was not wearing a mask at this time. Defendant walked away and left the area. After defendant left, P.H. walked to the top of one ramp while L.S. stayed at the bottom.

Defendant returned to the skate park, and this time he was wearing a red ski mask over his face. Defendant held a knife in his right hand, and the blade was three or four inches long. Defendant pointed the knife at L.S., demanded their wallets, and repeated the demand two or three times.

L.S. was going to tell defendant that he did not have a wallet, when P.H. suddenly jumped from the top of the skate ramp and landed on defendant. A struggle began as P.H. and defendant wrestled on the ground. P.H. "socked" defendant's head six or seven times with his fists. Defendant slashed at P.H.'s chest, shoulder, and head with his knife.

Defendant's ski mask moved around his face during the fight, and he stood up and took it off. P.H. also stood up. L.S. was about five feet away from defendant and could

---

[5] The facts of the offenses are from the preliminary hearing held on April 15, 2019, to which the parties stipulated as the factual basis for defendant's plea to assault with a deadly weapon and admission of the great bodily injury enhancement. The record does not contain any photographs of the skate park.

6.

clearly see his face. Defendant's hand was bleeding, and L.S. thought defendant might have accidentally stabbed himself.

Defendant told P.H., "You shouldn't have tried to be the hero. . . . [¶] . . . Stop trying to be the hero. You should join the gang. And we make rap music." Defendant added: "I am giving you a cool pass for now. [¶] . . . [¶] And don't be trying to do that." P.H. replied, "Please, I have a future." Defendant asked what that was, and P.H. said he wanted to "join the Feds." Defendant told P.H. that he would be on the "wrong side" and "get your friends in trouble," and again told P.H. to join "the gang. And we make rap music."

Defendant walked away from the minors. There was blood on P.H.'s clothes, and he told L.S. that defendant had stabbed him. L.S. was not injured and defendant did not take anything from them.

**P.H.'s Testimony**

P.H. testified he was standing on top of the skate ramp when he saw defendant aggressively rush toward L.S. Defendant was wearing a face mask, his right hand was extended toward L.S., and he appeared to be holding a weapon. Defendant said to give him their wallets.

As defendant moved toward L.S., P.H. jumped off the skate ramp and landed on defendant. They both ended up on the ground, which P.H. agreed was like a metal surface. P.H. testified he punched and kicked defendant several times. As they were fighting, P.H. felt blood on his body and realized defendant stabbed him. P.H. kept bleeding and felt weak, and defendant was able to break free from him.

Both defendant and P.H. stood up. Defendant told P.H. something like: "Oh, you are kind of tough. You should join my gang." Defendant eventually left.

P.H. testified he had a cell phone, but he did not call the police from the skate park because he was afraid defendant would come back and kill him. P.H. went home and his parents immediately took him to the hospital in Merced.

7.

P.H. testified defendant stabbed him on his shoulder and the back of his head. He was transferred to a children's hospital in Madera. P.H. needed nine stitches for the shoulder wound and had surgery to close the "big" wound on the back of his head. He was in the hospital for two to three days and took painkillers and antibiotics for two or three weeks.

## THE CRIMINAL CHARGES

On or about March 29, 2019, a criminal complaint was filed in the Merced Superior Court that charged defendant with count 1, felony child abuse of L.S. and P.H. (§ 273a, subd. (a)), with enhancements that defendant personally used a deadly or dangerous weapon, a knife (§ 12022, subd. (b)(1)), and he personally inflicted great bodily injury on P.H. (§ 12022.7, subd. (a)); and count 2, attempted second degree robbery of both victims (§§ 211, 664), with the deadly weapon enhancement.

Defendant was represented by Anthony Green of the public defender's office for the entirety of the criminal proceedings.[6]

## DEFENDANT'S IMMIGRATION STATUS

The entirety of the record before this court contains the following information about defendant's immigration status.

At the evidentiary hearing on his motion to vacate his convictions, defendant's father, Asobo Teneng George (George) testified he had been a prison pastor in Cameroon, he revealed human rights abuses that he saw in the prisons, he was persecuted by the Cameroonian government, and arrested, threatened, and tortured. In 2003, when defendant was a child, George fled Cameroon by himself and entered the United States

---

[6] When defendant's immigration attorney filed the motion to withdraw his plea in 2023, the public defender's office and Green voluntarily provided his confidential notes and records about defendant's criminal case. The documents were filed in support of defendant's motion to withdraw his plea, defendant waived his attorney-client privilege and, as will be discussed below, Green extensively testified about his representation of defendant at the evidentiary hearing.

under a grant of asylum.  In 2004, George filed asylum applications for his family, including defendant, to enter the United States.

On the date of the offense, defendant (born in 1997) was 21 years old.  He was a native and citizen of Cameroon.  The probation report was prepared at the time of the felony offense in 2019.  It stated that the probation officer interviewed defendant, and defendant stated that he entered the United States in 2007, when he would have been approximately 10 years old.[7]  In November 2014, defendant was 17 years old, and his status was adjusted to lawful permanent resident.

**The Preliminary Hearing**

On April 3, 2019, the defense requested discovery and subsequently received police reports, interviews with each victim, defendant's postarrest interview, and P.H.'s medical records.

---

[7] At the evidentiary hearing on defendant's motion to vacate, George testified that he filed the application for his family to come to the United States:  "I think that was 2007."  Defendant's opening brief on appeal states defendant entered the United States in 2014, but cites to documents filed in support of his motion that show his status was adjusted to legal permanent resident in 2014.

In 2019, the probation department prepared a preplea report, and it was later filed as the probation report for the sentencing hearing.  On appeal, the People extensively quoted from the probation report in its brief.  Defendant's briefs also quoted from the probation report, defendant did not object to the People's references to other statements in the report, and defendant similarly relied on the report to recite certain facts about his personal background.

The limited use of hearsay in a probation report in postjudgment proceedings is permitted so long as there is a substantial basis for believing the hearsay information is reliable.  (See, e.g., *People v. Hall* (2019) 39 Cal.App.5th 831, 837–838; *People v. Sledge* (2017) 7 Cal.App.5th 1089, 1095.)  The 2019 probation report, along with DHS's 2023 custodial report, are the primary sources for information about defendant's background.  While defendant quoted from the probation report in his briefing, it is not clear whether the probation report was before the trial court when it considered defendant's motion to vacate and withdraw his plea in 2024.

On April 15, 2019, the preliminary hearing was conducted. The two minors testified as set forth above and defendant was held to answer. The parties stipulated the complaint would be deemed the information and it was refiled that day.

According to Green's case notes, he spoke to defendant's parents about the case on April 29, 2019.[8]

On July 9, 2019, the trial court set defendant's jury trial for July 23, 2019. According to Green's case notes, the district attorney "want[ed] to take a harder look at this case. He may consider probation which should settle this." (Boldface omitted.)

On July 16, 2019, the court conducted the trial readiness conference, and defendant's jury trial was continued to September 17, 2019. According to Green's notes: "Offer is 5 years CDC[R]. Not much of an offer given [defendant's] lack of record. Need to get some character witnesses interviewed" (boldface omitted), and counsel completed an investigation request form.[9]

On September 5, 2019, the trial court held the readiness conference. According to Green's case notes: "Can settle this for [section] 245[, subdivision ](a)(1) with GBI enhancement."

---

[8] At the evidentiary hearing, Green testified he advised defendant's parents about the immigration consequences of the case. George testified at that hearing that he spoke with Green, but claimed Green did not discuss defendant's potential immigration consequences with him.

[9] According to the probation report, defendant did not have a juvenile record. In 2017, when he was approximately 19 years old, he pled no contest to misdemeanor driving under the influence, he was placed on probation for three years, and his driver's license was revoked. Defendant told the probation officer that he first used alcohol at the age of 19 years old, last used in November 2018, and drinks five to six times a year. He first used marijuana when he was 17 years old, smoked once or twice a month, and last used in February 2019. He denied any gang affiliation.

**Amended Information**

On September 5, 2019, the first amended information was filed that again charged defendant with count 1, felony child abuse of L.S. and P.H., and alleged he willfully and unlawfully, under circumstances likely to produce great bodily harm or death, injure, cause, and permit the two minors to suffer and be inflicted with unjustifiable physical pain and mental suffering (§ 273a, subd. (a)); count 2, attempted second degree robbery of both victims (§§ 211, 664); and a newly added count 3, infliction of corporal injury to a child, P.H., that he willfully and unlawfully inflicted cruel and inhuman corporal punishment and injury resulting in a traumatic condition upon P.H. (§ 273d, subd. (a)).

As to all counts, it was alleged defendant personally used a deadly or dangerous weapon, a knife (§ 12022, subd. (b)(1)), and he personally inflicted great bodily injury on P.H. in the commission or attempted commission of the offenses (§ 12022.7, subd. (a)).

According to Green's case notes, defendant's mother called him on September 23, 2019, to talk about the case.

**PLEA AND SENTENCING HEARINGS**

On October 4, 2019, defendant entered into a negotiated disposition as follows.

**Felony Advisement and Waiver of Rights Form**

On that day, defendant initialed and signed a four-page felony advisement and waiver of rights form that stated he would plead no contest to a newly added felony violation of section 245, subdivision (a)(1), assault with a deadly weapon, a strike offense, and admit a section 12022.7, subdivision (a) enhancement for personal infliction of great bodily injury; he would be sentenced to the lower term of two years for felony assault plus three years for the enhancement, for a total of five years in state prison; and the remaining charges would be dismissed.

Defendant initialed the paragraphs that stated his constitutional rights, that he understood and waived those rights, there was a factual basis for his plea, and he was freely and voluntarily entering his plea.

11.

**Section 1016.5 Immigration Advisement**

Defendant initialed paragraph No. 17, that stated:

"I understand that if I am not a citizen, my guilty or no contest plea *will result* in my deportation (removal), exclusion from admission to the United States, and denial of naturalization." (Italics added.)

Defendant signed an attestation at the end of the form, that he had personally read and initialed each paragraph, discussed the items with his attorney, his attorney answered all the questions he had about his plea, and he understood and agreed with what was stated in each paragraph.

Green signed the "ATTORNEY'S STATEMENT" (boldface omitted), that he reviewed the form with defendant, explained each right, and answered all defendant's questions about the plea. Green also attested he explained the consequences of his plea, "including, if applicable, *the immigration consequences as set forth in item number 17*, the elements of the offense(s), and the possible defenses" (italics added), he concurred in the plea and defendant's decision to waive his rights, and stipulated to a factual basis for the plea.

**Plea Hearing**

Also on October 4, 2019, the trial court conducted the change-of-plea hearing. Defendant was present with defense counsel Green.

The prosecutor moved to amend the information to add count 4, assault with a deadly weapon (§ 245, subd. (a)(1)) with a great bodily injury enhancement (§ 12022.7, subd. (a)), and stated defendant would plead guilty or no contest to count 4 and admit the enhancement; he would be sentenced to the lower term of two years for assault with a deadly weapon and a consecutive term of three years for the great bodily injury enhancement, for a total of five years in prison; and the remaining charges and enhancements would be dismissed.

12.

The trial court asked the parties if that was their understanding of the plea agreement. Both defendant and Green said yes. The court reviewed the felony advisement and waiver form and asked defendant if he initialed each paragraph and signed the form, if he understood and waived his rights, and if he had a sufficient amount of time to review the form with his attorney. Defendant said yes to each question.

**Immigration Advisement**

The trial court asked Green if he had sufficient time to discuss each advisement on the form with defendant. Green said yes, and asked to state additional matters for the record about immigration consequences.

> "MR. GREEN: And with regard to [defendant's] immigration consequences, he has been th[o]roughly advised of those. I have spoken with an experienced immigration attorney, Carolina Castaneda, who works in Merced, who informed me *[defendant] should have grave concerns about potential deportation as a result of this plea.* I've explained that to him. I've also explained to him that I believe that he may prevail at his trial. There are, in fact, defense issues, but at the same time, his exposure in this case is 10 years, six months. *And in light of all that, [defendant] tells [me] [he] still wants to proceed and take this plea and agree to this disposition.*

> "THE COURT: All right. [Defendant], is that correct?

> "THE DEFENDANT: *That is in fact correct.*

> "THE COURT: And then you understand after being advised of the immigration consequences, you've had a thorough discussion with your attorney about that?

> "THE DEFENDANT: I have.

> "THE COURT: And you still want to go forward with this as well?

> "THE DEFENDANT: I do." (Italics added.)

The trial court advised defendant that he was pleading to a strike conviction, which meant that if he was convicted of any new serious or violent felony in the future,

the prior strike conviction would substantially increase the amount of time he would have to serve. Defendant said he understood.

The trial court asked Green if he had sufficient time to discuss the felony advisement and waiver form with defendant; Green said yes. The court asked if he agreed with defendant's decision to enter the plea; Green said yes.

The parties stipulated to the preliminary hearing transcript as the factual basis for the plea. The trial court asked defendant if he had any remaining questions. Defendant said he was "clear on everything." Thereafter, defendant pled no contest to count 4, assault with a deadly weapon, and admitted he personally inflicted great bodily injury on P.H. The court dismissed the remaining charges and enhancements, and set the sentencing hearing for November 7, 2019.

The trial court signed the last page of the felony advisement of rights, attesting that defendant had knowingly, intelligently, and voluntarily waived his rights.

**Green's Case Notes About the Plea**

Green's case notes for October 4, 2019, the day of defendant's plea hearing, state:

> "[Defendant] is legal resident here from Cameroon, family granted asylum. Spoke with immigration attorney . . . Castaneda and *she informed me [defendant] should have grave concerns about being deported as a result of this deal. [Defendant] was thus advised.* Case has some merit from a defense point of view but exposure [is] 10 [years] 6 [months] *and [defendant] does not want to go to CDC[R] on a [section] 273a.*" (Italics added.)

**Sentencing**

On November 7, 2019, Green requested a continuance of the scheduled sentencing hearing "for further discussion with the defendant regarding immigration." The trial court granted the motion over the People's objection, and sentencing was reset for November 21, 2019.

On November 21, 2019, the trial court conducted the sentencing hearing and imposed the lower term of two years for count 4, assault with a deadly weapon, plus three

14.

years for the great bodily injury enhancement, for an aggregate term of five years in prison, consistent with the plea agreement. The court served defendant with a criminal protective order prohibiting contact with both victims for five years.

Defendant received a total of 277 days of credits (241 actual and 36 conduct). He did not file a notice of appeal from the judgment.

**DEFENDANT'S TRANSFER INTO FEDERAL CUSTODY**

On or about January 19, 2023, defendant was serving his sentence in CDCR custody at the California Correctional Institution (CCI) Tehachapi, and he was interviewed by a DHS deportation officer. According to DHS's report, defendant stated that he feared "persecution or torture should he be removed from the United States" and returned to Cameroon. Defendant did not make any claims to United States citizenship. Defendant's mother became a naturalized citizen in February 2022, when defendant was 25 years old. George, defendant's father, was an asylee applicant. Defendant did not meet the minimum requirements for derivation of citizenship.

On November 22, 2023, defendant was still at CCI Tehachapi when a DHS deportation officer personally served him with an arrest warrant. According to DHS's report, defendant was taken into custody by ICE's enforcement and removal operations "upon his release from CCI."

Defendant was served with a "Notice To Appear" at a removal hearing scheduled for December 12, 2023, at the Adelanto Detention Facility West. The notice stated defendant was a lawful permanent resident subject to removal (deportation) because of his conviction in 2019 for an "aggravated felony" since assault with a deadly weapon in violation of section 245, subdivision (a)(1) was a "crime of violence" and he was sentenced to at least one year. DHS's report stated defendant "clearly poses a public safety threat" because he was convicted of an aggravated felony and he did not "meet the minimal requirements for derivation of U.S. citizenship."

15.

## DEFENDANT'S MOTION TO WITHDRAW AND VACATE

On December 26, 2023, defendant filed in the trial court a "nonstatutory motion to vacate [his] conviction and withdraw plea." (Capitalization omitted.) Defendant was represented by Joshua Longoria, an immigration attorney, during the postjudgment proceedings on this motion.

Defendant's motion stated he was being held in the McFarland ICE detention facility and "awaiting imminent deportation from the United States in part due to this conviction." Defendant stated he could not rely on section 1473.7 to withdraw his plea and seek relief based on prejudicial error about the immigration consequences, because relief under that statute is "only available to persons no longer in custody, including constructive custody," and defendant was still in custody.

Instead, defendant was making "a common law nonstatutory motion to vacate . . . grounded in the Court's inherent authority to protect against constitutional violations occurring before it."

Defendant alleged Green was prejudicially ineffective pursuant to *Padilla v. Kentucky* (2010) 559 U.S. 356 (*Padilla*)[10] because he did not advise defendant "to plea bargain for a different, factually related, charge that carried no adverse immigration consequences. Neither was [he] advised that the sentence of 365 days would elevate the crime to an aggravated felony under federal immigration law and make him deportable. No attempt was made by [Green] to bargain for a sentence of 364 days to avoid the consequence of deportation. This resulted in [defendant] failing to have a meaningful

---

[10] As will be discussed in part I., *post*, *Padilla* held that criminal defense attorneys have an affirmative duty to understand and accurately explain the immigration consequences of a guilty plea to their noncitizen clients, and an ineffective assistance claim based on *Strickland v. Washington* (1984) 466 U.S. 668, may be raised as to a defense attorney's failure to advise the defendant of immigration consequences. (*Padilla*, *supra*, 559 U.S. at pp. 360, 373–374.)

16.

understanding of the immigration consequences stemming from the plea or sentence for this crime and he has been prejudiced by the errors of counsel."

Defendant asserted counsel's failure to investigate, advise, and plea bargain for an immigration-neutral offense constituted ineffective assistance since defendant was not aware of the immigration consequences when he entered his plea, and resulted in prejudice since defendant now faced deportation. If defendant had known of these consequences, "he would have bargained for the immigration safe alternative charge and sentence." Defendant "could have bargained for felony strikes which are immigration safe such as commercial burglary with the upper sentence of 3 years, dissuading a witness with a sentence of 364 days, and assault with a deadly weapon with a sentence of 364 [days]."

Defendant's motion concluded that Green's conduct fell below a defense counsel's standard of care and resulted in prejudice, because defendant did not meaningfully understand the consequences of his plea, and his plea should be withdrawn and the conviction vacated.

Defendant's motion was also based on section 1016.5, and he argued both the trial court and Green violated that statute by failing to advise him about the immigration consequences at the time of his plea, that assault with a deadly weapon was a crime of violence under federal law and he would be deported; and if he had known of the consequences, he would have "bargained for the immigration safe alternative and would not have taken the plea that was offered."

In support of the motion, defendant filed exhibits consisting of the first amended information, abstract of judgment, DHS's "NOTICE TO APPEAR" (boldface omitted), and DHS's custodial report. He also filed the following declarations.

**Defendant's Supporting Declaration**

Defendant filed a sworn declaration in support of his motion, that is two pages and consists of six paragraphs. First, defendant stated he was a citizen of Cameroon and detained at the McFarland ICE detention facility.[11]

Next, defendant declared "[o]n or about March 24, 2019," he was charged with child abuse, robbery, and corporal injury to a child. Defendant declared that "[o]n or about November 26, 2019," he pled "guilty or nolo contendere" to an amended count of "assault," in violation of section 245, subdivision (a)(1), under the advice of his defense attorney, and he was sentenced to five years.[12]

Defendant declared he "recently learned" from Longoria that he "might be able to vacate the conviction under a recently passed California law."[13] "Longoria also told me

---

[11] This court's records show defendant is housed at Mesa Verde Detention Facility in Kern County.

[12] The record shows that nearly every aspect of this paragraph is erroneous. Defendant was alleged to have committed the offenses on or about March 24, 2019. The complaint was filed on March 29, 2019, and initially charged defendant with *two* counts: felony child abuse and attempted second degree robbery, with deadly weapon and great bodily injury enhancements. On September 5, 2019, the first amended information was filed that charged defendant with *three* counts: felony child abuse, attempted second degree robbery, and infliction of corporal injury to a child, with the deadly weapon and great bodily injury enhancements.

Defendant did not plead "guilty or nolo contendere" to "assault" on November 26, 2019. Instead, on October 4, 2019, he pled no contest to the newly added charge of assault with a deadly weapon (§ 245, subd. (a)(1)), and admitted the great bodily injury enhancement (§ 12022.7, subd. (a)). He was sentenced to an aggregate term of five years on November 21, 2019.

Defendant repeated these erroneous dates in his motion to withdraw. Defendant did not file a supplemental declaration to correct these errors.

[13] Defendant's reference to a "recently passed California law" presumably refers to section 1473.7, which became effective in 2017 (*People v. Benitez-Torres* (2025) 112 Cal.App.5th 1252, 1262 (*Benitez-Torres*)), but his motion declared it was not based on that statute because he was still in "custody."

18.

that if I did not get the conviction vacated, I would be deported. I immediately let him know that I wanted this motion filed. I believe that I have acted promptly, without undue delay, in seeking to vacate the conviction."

Finally, defendant declared: "If I had known the severe immigration consequences that came with the conviction, I would have bargained for a plea that would not lead to my deportation. I would have done everything I could to protect my immigration rights. Including pleading up to a more serious charge, waiving time credits, or taking a felony strikes [*sic*]."

Defendant filed separate declarations stating he was waiving his attorney-client privilege so that Green, his trial attorney, could testify at a hearing on his motion to withdraw; and he was waiving his right to appear at hearings on his motion and his attorney could appear on his behalf.

**Longoria's Declaration**

Longoria filed a supporting declaration that defendant's conviction of violating section 245, subdivision (a)(1), with a sentence of 365 days or more, constituted an aggravated felony that carried severe immigration consequences, and resulted in defendant losing his legal permanent resident status and facing deportation.

Longoria declared there were "immigration safe pleas which were available" at the time of his plea. "For example, the facts could support an immigration safe plea of separate charges, including a sentence of 364 days or less for . . . section 245, a sentence of 364 days or less for a violation of dissuading a witness, and a sentence of [section] 459, commercial burglary with the upper sentence of 3 years. Such an alternative is immigration safe for this defendant and were factually supported."

Longoria stated that in his opinion, Green's "failure to bargain for the immigration-safe plea fell below the standard of care expected of a reasonable defense attorney in California at that time."

**The People's Opposition**

On January 29, 2024, the People filed an opposition to defendant's motion to withdraw his plea, and attached the plea agreement and an excerpt from the reporter's transcript of the plea hearing as supporting exhibits.

The People stated defendant failed to satisfy the requirements to obtain relief under section 1016.5 because he was fully advised in the felony advisement and plea form that his plea " 'will result' " in his exclusion or deportation. He was again advised at the plea hearing, when Green stated he consulted with an immigration attorney who had " 'grave concerns' " that defendant faced deportation, he advised defendant of these concerns, and defendant wanted to go ahead with the plea. The trial court asked defendant if Green was correct about the advisement, and he had a thorough discussion with his attorney, and defendant said yes.

The People concluded defendant failed to show prejudice because when the trial court questioned him about the immigration consequences, he said that he wanted to proceed with the plea despite the immigration advisements.

**Defendant's Supplemental Exhibits**

Defendant did not file a reply brief or another supporting declaration. He filed supplemental exhibits consisting of the full transcript for the plea hearing, the minute order where the trial court continued defendant's sentencing hearing in 2019, the record and case notes about defendant's criminal case from Green and the public defender's office, an immigration/crime chart addressing deportable offenses, DHS's notice to appear for the deportation hearing, and documents filed by George in 2004 to bring his family to the United States, as summarized above.

## EVIDENTIARY HEARING

On March 22, 2024, the trial court conducted the evidentiary hearing on defendant's motion to withdraw his plea and vacate his conviction.[14] Defendant was represented by Longoria. Deputy District Attorney Claudia Juarez appeared for the People.

As noted above, defendant filed a declaration where he waived his right to appear at hearings on his motion, and he did not appear by video conference. Longoria called three witnesses: Green, defendant's trial attorney; Castaneda, the immigration attorney consulted by Green; and George, defendant's father.

**Green**

Green, the Chief Deputy Public Defender for Merced County, testified he independently recollected his representation of defendant, and had voluntarily provided the entirety of his records to Longoria. He had received training on immigration consequences of state convictions through the California Public Defender's Association. In addition, Castaneda, an experienced immigration attorney, previously provided training to the public defender's office about immigration consequences from criminal convictions.

Green testified he spoke to defendant about his immigration status. Defendant had an accent but "spoke English perfectly well," defendant never asked for an interpreter, and they did not have any problems communicating.[15]

---

[14] Both parties waived a court reporter for the evidentiary hearing and stipulated that an audio recording would be made of the proceedings, and that recording was filed with this court as part of the record on appeal. This court ordered the Clerk of the Merced County Superior Court to prepare a reporter's transcript of the evidentiary hearing, from which the following summary is taken, vacated the parties' briefs, and ordered the parties to refile their briefs consistent with the augmented reporter's transcript.

[15] The DHS custodial report stated defendant understood and spoke English.

Green also spoke to defendant's father and mother "throughout the proceedings and where we were at and what was going on and what the offers were and my concerns about immigration. And mostly, I spoke to his father, but I did talk to his mother as well. And I believe his father understood everything as well. And his father seems to speak English quite well, too. So I don't believe we had any communication problems."

Green learned George fled an African country, and George and family were in the United States through a grant of asylum.

Green had defendant's case for six months, and there were lengthy discussions with the prosecutor about a possible plea agreement. Green testified the People made a plea offer for assault with a deadly weapon for the lower term of two years, plus the great bodily injury enhancement for three years, for an aggregate prison term of five years. Green believed the plea offer was "potentially" favorable because defendant "was at least eligible for parole once he did the two years."

However, Green "already had strong beliefs" that defendant would face a "significant immigration issue." He knew from practice experience that a strike conviction with a prison sentence would "be a red flag for immigration purposes" and result in his deportation, and the "better result" would be to go to trial and win.

Green testified defendant had been charged with child abuse with great bodily injury, and that would "create red flags in the prison system. If people find out that's what you're locked up for, that puts you in a more dangerous position."[16]

Green was prepared for trial. Defendant had a legitimate self-defense theory because he gave an "early" statement to the police that he did not do anything and the minors attacked him, and one minor admitted at the preliminary hearing that he

---

[16] Green's case notes, entered the day of the plea hearing, state that defendant "*does not want to go to CDC[R] on a [section] 273a*," the charged offense of felony child abuse. (Italics added.) Defendant's declaration filed in support of his motion to withdraw did not address this particular issue.

22.

"instigat[ed]" the fight with defendant. However, both minors testified at the preliminary hearing that defendant first pulled a knife and tried to rob them, and what actually happened would have created a question for the jury. Green also had to consider that the prosecutor was a respected and good trial attorney, and could not guarantee a result.

Defendant's exposure for the charged offenses and enhancements was 10 years eight months. Given defendant's lack of a prior criminal record, Green did not believe the trial court would have imposed the maximum term if he was convicted by a jury, but defendant would have likely received eight years in prison for child abuse and that could have placed him in danger.

Based on his concerns about defendant's immigration status, Green contacted Castaneda to consult with her about the immigration consequences for the prosecution's plea offer, and "[p]robably" for the charged offenses, "so I could inform [defendant] that I'd done that." Green spoke to Castaneda on the telephone, she did not have any direct communication with defendant, and she did not provide a written evaluation. Green provided Castaneda with information about defendant's specific immigration status, the charges, the plea offer, and proposed disposition.

Green testified that Castaneda said defendant faced "severe immigration consequences." She "agreed that this was a serious matter where there would be likely immigration consequences. And I believe her words were grave consequences, which is what I put on the record [at the plea hearing]."

> "[LONGORIA:] Did you speak to . . . Castaneda or research at all any alternative pleas that could still be feeling these strikes that are immigration safe?

> "[GREEN:] I did, and—but the reality is that, given the facts of the case from the prosecution's point of view, they were not willing to negotiate a probation deal. And so—and I mean, *I can't force the prosecution to make an offer that's going to be immigration friendly if they think the case is serious enough to merit prison and a strike.* That's what the trials are for. And I was prepared to do the trial. [¶] . . . [¶]

23.

"[LONGORIA:] Was there any focus on trying to alter the charges in a way that's immigration safe? For example, pursuing residential burglary or dissuading a witness[,] false imprisonment, that could be high exposure but immigration safe?

"[GREEN:] Well, the reality is, is a 15-year-old kid got stabbed severely enough that he had to spend significant time in the hospital. So the prosecution—I can't recall the specifics of our conversation, but given those facts, *the prosecution was not going to consider anything that did not involve a GBI enhancement*.

"[LONGORIA:] Was there any research to see whether he could still take a GBI enhancement with the statute that's immigration safe?

"[GREEN:] Not that I recall, *but my information was if he took [the] GBI enhancement and went to prison, as I said, he would most likely get deported, and that's what I told him.*

"[LONGORIA:] And that's based on the information that he got from . . . Castaneda?

"[GREEN:] Yes, and other training I've had on immigration consequences." (Boldface omitted, italics added.)

Green testified he tried to negotiate for a probation disposition that would have "significantly mitigate[d]" any immigration consequences, but "it was clear that the prosecution was not going to agree to that," and he shared this information with defendant. He also "made it pretty clear to [defendant] that if he resolved this case for a strike where he went to prison, *he would almost certainly get deported*." (Italics added.)

"So the fact that *the prosecution was not willing to settle this for anything less than a violent strike in prison* did make the ultimate offer appealing in that regard, given that you just don't know the outcome of the trial. So that's something else I had to talk to [defendant] about what's likely to happen at trial, what could happen. And you can't crystal ball trials. I've done many trials, and I thought we had some—a good argument to be made that this was a self-defense case . . . and I was prepared to do that, but I also had to appreciate we had two minor alleged victims who, in my opinion, testified well at the preliminary hearing. And given that it's a self-defense case, [defendant] would likely have to testify, and I was concerned that [defendant] might not present well, just from my experience working with him.

"So factoring in all those things, I thought that was about as good an offer as we were going to get. . . .  I do not recall putting any pressure on [defendant] to take this offer because, as I said, I thought I made it clear to him that he had severe immigration consequences to be concerned about, and *I expected we would go to trial for that reason if for no other reason. But right before trial, he told me he wanted to take that offer . . . .* "[17] (Italics added.)

Green testified that if defendant took the plea offer, "he was at least eligible for parole once he did the two years.  I don't believe that happened, but it is something else to consider.  So—but it does appear that he must have done the whole five years since this is coming up now."

---

[17] On appeal, the People's brief recites the probation officer's report and recommendation's factual statement and, as already noted, defendant has not objected. The probation report's factual statement is taken from the police report, and contains additional information about the offenses that was not introduced at the preliminary hearing, but consistent with Green's hearing testimony about the evidence.

According to the probation report, P.H. suffered one stab wound on the right side of the back of his head, and two stab wounds to his right shoulder.  He required surgery to remove "potentially a piece of metal still lodged in his head."

P.H. told the police that defendant said he had an Instagram account.  P.H. said he searched Instagram accounts based in the Atwater area, found defendant's account, and immediately recognized him from his photograph.  Defendant had posted a photograph on his account that showed a bloody hand holding a knife.

On March 26, 2019, defendant was arrested.  He had a bandage on his right hand. He possessed a knife with dried blood on it, and it matched the knife shown in the Instagram photograph.  Defendant was advised of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and waived his rights.  Defendant said he was attacked by the " 'little kid and the chubby kid,' " there was a fight, and he acted in self-defense. Defendant said he approached them and asked for money, and one kid jumped on him from the top of the skate ramp.  Defendant said he feared for his safety, pulled out his knife, and cut his own hand.  It was the same knife he had when arrested.  He admitted he hit one minor with the knife " 'a couple of times.' "  Defendant said that after the fight, he talked with that minor, told him he was "pretty cool," and gave his Instagram account. Defendant did not realize the minor had serious injuries.  Defendant said he posted the photograph of his bloody knife on Instagram to " 'tell people if you're in my face I'm going to defend myself.' "  Defendant said he usually asked people for money with no intention of attacking anyone.

25.

"[LONGORIA:]  So it sounds like it was a bit of a compromise to take this plea, but given the exposure and the facts, . . . the minor witnesses seem to have performed well in [the] preliminary hearing that you were comfortable signing off on this deal?

"[GREEN:]  . . . I was concerned about the immigration consequences, and perhaps I should have been more concerned and more emphatic with [defendant] that this could be a bigger problem.  *I thought he understood that.  Maybe he did not.*  Maybe he did not fully understand just how severe this could be.  But I mean, he did understand, I believe, the benefits of this deal versus what would happen if he went to trial and lost.  Okay?  So that's about all I can say about that, I think."  (Boldface omitted, italics added.)

Defendant's trial was set for September 17, 2019, and Green believed the prosecution made the plea offer for assault with a deadly weapon and the great bodily injury enhancement in August or early September 2019.

At the trial readiness conference, Green advised defendant about the prosecution's offer and the immigration consequences, and defendant said he wanted to take the deal. Green believed he vacated the trial date and continued the matter so he could "double check with [defendant] and make sure he understood everything before we proceeded."

Green testified he told defendant he would "almost certainly" be deported if he took the plea offer.

"[JUAREZ:]  When you informed [defendant] that he was almost certainly going to get deported for the [section] 245[, subdivision ](a)(1) conviction, did you form the opinion that he understood what you were telling him?

"[GREEN:]  *I believe he did.*  And I also believe that he understood that I was willing to do this trial, and . . . then prevailing at the trial was really the only way he could say with any sort of certainty that he would not get deported . . . ."  (Boldface omitted, italics added.)

Defendant never said he did not want to accept the plea or he wanted to try for a different type of plea.

26.

The plea hearing was held on October 4, 2019. Green testified he placed on the record that defendant faced grave immigration consequences, consistent with Castaneda's advice.

Green believed defendant was thoroughly advised of the immigration consequences: "I can say that I told him, yes, you would most likely get deported if you make this deal. I do believe I advised him of that." Green testified if he had another client similarly situated as defendant, he would be "much clearer on the fact that, yes, this is almost certainly going to result in deportation. As I said, I can't say to a moral certainty, but at the same time, yes, I mean I would be much more emphatic about that."

> "[LONGORIA:] Would it be fair to say that you were more focused on the immigration consequences, hitting them with a conviction—not so much searching out that safe haven or immigration safe plea deal that could still have high exposure, still have the strikes, still have the GBIs, but be immigration safe?

> "[GREEN:] . . . [T]he deal that we had, I believed, was as good a deal as we were going to get from the prosecution. And so exploring any alternate deals . . . I initially tried to get a probation deal, and that would have definitely helped him if we could have gotten a probation deal, even with a strike, as long as he did less than a year in the county jail. But even then, he could still potentially face immigration consequences, since he would be doing time on a strike. So as far as trying to craft a better deal . . . I believe we must have. But again, this was five years ago, and *I can say just from my professional experience and looking over this case again, that the deal we reached was about as good as could realistically be expected, given my experience with the District Attorney's Office of Merced County*." (Boldface omitted, italics added.)

**Castaneda**

Castaneda testified she had been an immigration attorney since 2013. She was with the Immigration Legal Resource Center in San Francisco, and previously practiced in Merced and Madera.[18]

---

[18] Castaneda appeared via video conference by agreement of the trial court and the parties.

27.

Castaneda testified that under federal immigration law, a legal permanent resident would "[m]ost likely" suffer a "particularly serious crime" and an "aggravated felony" if convicted of child abuse in violation of section 273a, subdivision (a) with a great bodily injury enhancement, and sentenced to more than one year. Such a defendant would be subject to deportation and the offense would prevent cancellation of removal.

Castaneda testified a conviction of assault with a deadly weapon in violation of section 245, subdivision (a)(1), with a sentence exceeding one year, also would be an aggravated felony.

If a legal permanent resident pled to an aggravated felony, the defendant would be ineligible for immigration relief and subject to deportation. The only forms of available relief would be withholding or deferral of removal based on the "Convention Against Torture," but it was extremely rare to obtain such relief and defendant's conviction would pose a significant impediment.

Castaneda generally testified about immigration-neutral pleas without addressing the facts of defendant's case. Castaneda explained there were crimes such as burglary or false imprisonment that could carry a sentence of over one year but would be immigration neutral. It was possible that a defendant could "plead up" (boldface omitted) to a more serious charge with a longer sentence that would be immigration neutral. A defense attorney had the duty to seek out "safe haven or immigration safe pleas" (boldface omitted) for such a defendant.

Castaneda testified defense attorneys occasionally call her for advice about immigration consequences in criminal cases. She gives advice based on information provided by the attorneys. "Usually, it would happen that sometimes, some attorneys would contact me asking for a letter to be able to negotiate a plea deal with a Defense attorney, so I would provide a letter in writing. But sometimes, folks from the Public Defender's Office would call me when they were in the middle of a case, like, hey, is this good? Is this bad? And it would just be a phone call. However, I wouldn't have the full

28.

immigration background of the individual. So it would be . . . advice based on the information that we had then and there."

In order to determine a defendant's possible immigration consequences, the defense attorney had to provide full and accurate information including when the defendant entered the country, the person's status, and how that status was obtained. A legal permanent resident could lose this status if he or she commits an aggravated felony within five to seven years after obtaining that status.

Castaneda did not usually meet with the defendants in response to telephone inquiries from their attorneys unless a more thorough discussion was needed. If she met with the defendant, she would produce an immigration-consequence letter. "But if it was, like, a situation where it was sort of like an emergency, they needed a decision then and there, then, no. So the advice would be, well, based on the information that we have right now, this is the potential consequence."

Castaneda did not have an independent recollection of speaking to Green about defendant's case, his specific immigration status, or whether she spoke directly to defendant. She did not have any notes about the case, police reports or other information about the criminal charges, and did not prepare a written document about immigration consequences. Given the absence of notes or a report, she believed she did not meet with defendant.

**Defendant's Father**

George testified he served as a prison pastor in Cameroon.[19] He revealed human rights abuses that he saw in the prisons, and he was persecuted by the government and arrested, threatened, and tortured. George testified that in 2003, when defendant was a child, George fled Cameroon by himself and left his family behind. George entered the

---

[19] The parties agree George was a pastor in the "prisons" of Cameroon, and the augmented reporter's transcript erroneously states he was a pastor in the "presence [sic] of Cameroon."

United States under a grant of asylum.  He filed papers for his family to come to the United States, "I think that was 2007."[20]

George testified that at the time of the evidentiary hearing, some of the same people were still in charge of the Cameroonian government.  George believed defendant, as his son, would face persecution if he was returned to Cameroon and he would be "gone."

George testified he spoke to Green during defendant's criminal proceedings, but Green did not say that defendant would face immigration consequences if he entered into the plea.  "What . . . Green told me at that time—because [defendant] was, like, trying to say he was going to stand and defend his case.  The rest of the conversation between him and . . . Green, I don't know."

George did not consult an immigration attorney about defendant's case "because we did not know.  We were ignorant of what was going on, and we were just knowing that he was in the court system.  So we didn't know exactly what was going on and what were going to be the consequences for him."[21]

**Defendant's Closing Argument[22]**

In his closing argument, Longoria admitted "it does seem" defendant was advised "of some of the consequences" of his plea, and "[i]t seems like the public defender did

---

[20] In documents filed in support of his motion to withdraw his plea, defendant included George's applications to bring his wife and children to the United States, that were filed in 2004.  The only evidence of defendant's entry date is contained in the probation report, where defendant told the probation officer that he came to the United States in 2007, when he would have been approximately 10 years old.

[21] As previously noted, Green testified that he spoke to defendant's parents about defendant's immigration issues, and his case notes confirm he spoke to the parents during the criminal proceedings.

[22] After the testimony of the three witnesses, Longoria proceeded with closing argument.  He did not request a continuance to file a supplemental declaration from defendant to address the conflicting evidentiary issues between his supporting declaration and Green's hearing testimony.

try" and "did the right thing regarding figuring out whether [section] 245[, subdivision ](a)(1) was the deportable [offense]. *He correctly advised [defendant] of that portion of it*." (Italics added.) Defendant "was advised properly that this conviction was a deportable offense," and Green "was correct when he said that there are grave consequences, because that is true."

However, Longoria argued a criminal defense attorney was required to "advise clients of the potential harm or tell them of . . . the concrete harm," and also to "work towards an immigration safe resolution." Green focused only on "potential consequences, not the concrete, solid consequences that . . . Castaneda said." Castaneda testified that once defendant agreed to the plea bargain, he was going to be deported and it was highly unlikely he could defeat that. However, Green "kind of left that door open" and he was not clear about the severity and concrete nature of the immigration consequences.

Longoria also argued Green "didn't do the proper steps to seek out an alternative" plea, and there were "clear alternatives" that were felony strikes but immigration-neutral offenses.

> "I went to the location of the area. [Defendant] could have gotten charged with a residential burglary. There's other crimes that have happened with homeless people in that same area in that same time frame. He could have gotten a dissuading a witness. He could have gotten a false imprisonment. There are several of those or all together, which would have left [defendant] with more exposure, more severe consequences, even two felony strikes that would have still left [defendant] immigration safe."[23]

---

[23] The evidentiary record does not contain any descriptions or photographs of the location where defendant accosted the two minors, aside from their preliminary hearing testimony that it happened at a "skate park" with "ramps," and P.H. and defendant struggled on the ground, which was like a "metal" surface. The probation report describes the area as the "skate park" at "the Osborn Park Area." In part IV., *post*, we will address defendant's repeated arguments that burglary was a valid alternate charge in this case.

31.

Longoria criticized Green's focus on preventing deportation by either obtaining a plea agreement for probation or winning at trial, because that was contrary to Castaneda's advice to plead to alternate offenses that would have protected defendant from severe immigration consequences.

Longoria also criticized Green's statements at the plea hearing, that defendant had been "thoroughly advised" of the immigration consequences, which was contrary to Castaneda's testimony. Green "definitely took a lot of really good steps, and he tried his best to do what was right" but he failed to consider alternative pleas to more serious offenses and strikes that would have been "ideal" for defendant. Longoria again argued Green could have negotiated for the felony strike of dissuading a witness, residential burglary which was a strike, commercial burglary which was not a strike, or criminal threats with a sentence of less than one year. "A combination of all those . . . would have been a superior form of relief" than what defendant received.

While Green's position was defendant "wanted to keep himself out of jail," defendant was serving additional time in federal custody and still trying to fight this case, which showed he cared about his immigration status and did not want to be deported to a country where his father was tortured.

Longoria concluded: "[B]efore we file[d] this motion, or I think shortly thereafter, we did reach out to the People regarding trying to do no opposition to this plea and doing two felony strikes [that] would be even more reasonable. There's ways to resolve this case that were there. And I think the Defense counsel did do a lot right, but I think he just missed the mark here."

**The People's Closing Argument**

Juarez argued the standard was not whether there was an alternate resolution available, but whether defendant was properly advised at the time of his plea and, if he was properly advised, he would not have accepted the plea offer. Longoria admitted defendant was properly advised, and both the written plea form and the statements at the

32.

plea hearing showed defendant was advised he "would almost certainly get deported," and that was confirmed by the trial court at the plea hearing. Defendant responded that he understood and still wanted to proceed with the plea.

Juarez concluded defendant understood the advisements, and there was no contemporaneous evidence to suggest he did not understand the advisements given to him. He still decided to accept the plea knowing the consequences would be likely deportation. There was no evidence to support defendant's current claims, that he did not understand the advisements and would not have accepted the plea.

### THE COURT'S DENIAL OF DEFENDANT'S MOTION

After hearing the parties' arguments, the trial court denied defendant's motion to withdraw his plea and made the following findings.

> "In the Court's opinion, it was clear that the Defendant understood the consequences of his plea. The record is clear on that. The Defense attorney today actually reemphasize[d] that in this court's opinion. The Defendant can't now turn around and not take the benefit of his plea and have it withdrawn. He understood the consequences. He said he understood the consequences. The Defense attorney even got expert advice from the immigration attorney. I'm just not convinced that he didn't know anything or didn't know the proper procedure, didn't know anything about immigration consequences. He was totally and thoroughly advised in that basis."

On May 14, 2024, defendant filed a notice of appeal, and the trial court granted his certificate of probable cause.

### DISCUSSION

**I. THE NATURE OF DEFENDANT'S MOTION TO WITHDRAW**

Defendant filed a motion in the trial court to withdraw his plea and alleged the court failed to give him the immigration advisement at the plea hearing as required by section 1016.5. He also alleged Green, his criminal defense attorney, was prejudicially ineffective for failing to fully advise him about the immigration consequences of pleading

33.

to an aggravated felony, and failing to negotiate for an immigration-neutral conviction to protect his status as a lawful permanent resident.

In filing this motion, defendant stated he was "precluded from seeking relief" pursuant to section 1473.7, subdivision (a)(1) "as he is still in custody." Instead, he sought to withdraw his conviction based on "a common law nonstatutory motion to vacate . . . grounded in the Court's inherent authority to protect against constitutional violations occurring before it."

On appeal, defendant renews his arguments about section 1016.5 and ineffective assistance. However, he also argues that despite the statement in his motion that he was precluded from relying on section 1473.7, subdivision (a)(1) because of his custodial status, both the trial court and the district attorney treated his motion pursuant to the provisions of section 1473.7. Defendant argues this court should review the trial court's ruling under that statute, and the evidence shows he met his burden and remand is required under section 1473.7 to permit withdrawal of his plea.

We begin with a preliminary review of the type of motion that defendant filed in the trial court to withdraw his plea, and whether each aspect of that motion is cognizable in this appeal.

## A. Section 1016.5

Defendant's motion asserted the trial court and counsel failed to give him the following immigration advisement required by section 1016.5, subdivision (a): "If you are not a citizen of the United States, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation . . . or denial of naturalization pursuant to the laws of the United States." After judgment has been imposed, a defendant may move to withdraw his plea and vacate the judgment if he or she proves the section 1016.5 advisement was not given. The court's denial of the motion is an appealable order. (*People v. Totari* (2002) 28 Cal.4th 876, 879.)

To the extent that defendant's motion to withdraw was based on the failure to comply with section 1016.5, the motion was cognizable as filed, and the trial court's denial of the motion on that basis will be addressed in part II., *post*.

## B. *Padilla* and Section 1016.2

Defendant's motion also alleged ineffective assistance based on *Padilla*, where the United States Supreme Court held the Sixth Amendment's guarantee of effective assistance of counsel requires attorneys to advise clients if their guilty plea would make them "subject to automatic deportation," and an attorney is ineffective under *Strickland v. Washington*, *supra*, 466 U.S. 668 in failing to so advise and prejudice results. (*Padilla*, *supra*, 559 U.S. at pp. 360, 364, 368, 374.) *Padilla* also described counsel's duty to "plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce[s] the likelihood of deportation, as by avoiding a conviction for an offense that automatically triggers the removal consequence." (*Id*. at p. 373.)

Effective January 1, 2016, the Legislature codified *Padilla* and related California case law (§ 1016.2, subds. (c), (h)), and found immigration consequences " 'may be by far the most serious penalty flowing from the conviction.' " (*Benitez-Torres*, *supra*, 112 Cal.App.5th at pp. 1261–1262; see § 1016.2, subd. (c).) "Defense counsel shall provide accurate and affirmative advice about the immigration consequences of a proposed disposition, and when consistent with the goals of and with the informed consent of the defendant, and consistent with professional standards, defend against those consequences." (§ 1016.3, subd. (a).) Section 1016.3 further states that "[t]his code section shall not be interpreted to change the requirements of Section 1016.5." (§ 1016.3, subd. (c).)

## C. Defendant's Common Law Nonstatutory Motion for Relief

Defendant raised his *Padilla* and ineffective assistance arguments, along with his section 1016.5 contentions, in a postjudgment motion styled as "a common law

35.

nonstatutory motion to vacate . . . grounded in the Court's inherent authority to protect against constitutional violations occurring before it."

A nonstatutory motion to vacate a plea based on ineffective assistance "is the legal equivalent of a petition for a writ of error *coram nobis*; the terms are interchangeable." (*People v. Aguilar* (2014) 227 Cal.App.4th 60, 72–73; see *People v. Kim* (2009) 45 Cal.4th 1078, 1096 (*Kim*).)

"The writ of error *coram nobis*—and therefore the equivalent nonstatutory motion to set aside a plea—'serves a limited and useful purpose.  It will be used to correct errors of fact which could not be corrected in any other manner.' " (*People v. Aguilar*, *supra*, 227 Cal.App.4th at pp. 73–74; see *People v. Mbaabu* (2013) 213 Cal.App.4th 1139, 1146–1147.)

"That a claim of ineffective assistance of counsel, which relates more to a mistake of law than of fact, is an inappropriate ground for relief on *coram nobis* has long been the rule." (*Kim*, *supra*, 45 Cal.4th at p. 1104.)  "Because the writ of error *coram nobis* applies where a fact unknown to the parties and the court existed at the time of judgment that, if known, would have prevented rendition of the judgment, the remedy does not lie to enable the court to correct errors of law.  [Citation.]  This includes constitutional claims, such as a claim that counsel was ineffective in failing to admonish a defendant of the immigration consequences of his conviction." (*People v. Mbaabu*, *supra*, 213 Cal.App.4th at p. 1147.)

Longoria, defendant's immigration attorney, obviously moved with due diligence to file a motion to withdraw the plea within one month of defendant being taken into ICE custody and served with notice of a deportation hearing.  Defendant's nonstatutory motion, based on *Padilla* and ineffective assistance arguments, was the equivalent of a writ of error of *coram nobis*.  However, a claim of ineffective assistance, based on counsel's alleged failure to advise him about immigration consequences and negotiate a

different plea, does not state a claim for relief on *coram nobis*. (*Kim*, *supra*, 45 Cal.4th at p. 1104.)

Defendant's motion suggested that he was on parole for his criminal conviction when taken into ICE custody from CDCR, and he was ineligible to file for relief under section 1473.7 because of that constructive custody. In an abundance of caution, defendant also should have filed a petition for writ of habeas corpus since he was still in custody, because his attempt at *coram nobis* relief likely would have been denied. (*Cruz-Lopez*, *supra*, 27 Cal.App.5th at pp. 220–221 [habeas petition is appropriate means to seek relief if petitioner is in criminal custody].)

## D. Section 1473.7, Subdivision (a)(1)

Effective January 1, 2017, the Legislature enacted section 1473.7, subdivision (a)(1) to create an ameliorative remedy for people who entered pleas that carried adverse immigration consequences. (*Benitez-Torres*, *supra*, 112 Cal.App.5th at p. 1262.) The statute was enacted to " ' "fill a gap in California criminal procedure" ' " because *Padilla*'s ineffective assistance holding and section 1016.3 were not retroactive, and a writ of habeas corpus was not a remedy available to those who were no longer in custody for their convictions. (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 309 (*Rodriguez*).)[24]

As will be further discussed in part III., *post*, section 1473.7, subdivision (a)(1) "allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is 'legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against,

---

[24] *Padilla*'s ineffective assistance holding is not retroactive to vacate convictions that became final before it was decided in 2010. (*Chaidez v. United States* (2013) 568 U.S. 342, 344; *Rodriguez*, *supra*, 68 Cal.App.5th at p. 308.) Section 1016.3's statements about the defense counsel's duties in an immigration case are not retroactive to cases that were final prior to 2016. (*People v. Olvera* (2018) 24 Cal.App.5th 1112, 1116.)

or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' " (*Espinoza*, *supra*, 14 Cal.5th at p. 316.)

As relevant herein, a moving party may file a section 1473.7 motion only if the movant "is no longer in criminal custody." (§ 1473.7, subd. (a).) A person on probation or parole from the criminal conviction is in "constructive custody," and ineligible to move for or receive relief under section 1473.7. (*People v. DeJesus*, *supra*, 37 Cal.App.5th at pp. 1130–1131; *Cruz-Lopez*, *supra*, 27 Cal.App.5th at pp. 220–221.)

Instead, a person still in actual or constructive custody for his or her criminal conviction may challenge the legality of that detention by filing a petition for writ of habeas corpus based on the alleged failure to understand immigration consequences. (*Rodriguez*, *supra*, 68 Cal.App.5th at pp. 314–315.) However, a defendant in custody "for another, unrelated conviction" is not barred from moving to vacate a conviction pursuant to section 1473.7. (*Rodriguez*, at p. 315.)

In *Villalba*, *supra*, 89 Cal.App.5th 659, the defendant filed a section 1473.7, subdivision (a)(1) motion to withdraw his plea and alleged he did not understand the immigration consequences. He relied on section 1473.7 even though "the expiration of [the] defendant's probation was just five months away" when he filed the motion. (*Villalba*, at p. 671.) The prosecution did not oppose the motion or argue the trial court was barred from considering the merits since the defendant was still in constructive custody. The court heard the motion, and denied relief on the merits of his section 1473.7, subdivision (a)(1) arguments. (*Villalba*, at p. 670.)

On appeal in *Villalba*, the defendant challenged the trial court's ruling. The People argued for the first time that the motion was premature since the defendant was still on probation and in constructive custody when he filed it, he was ineligible for relief under section 1473.7, and his appellate arguments should be rejected. (*Villalba*, *supra*, 89 Cal.App.5th at p. 670.)

*Villalba* rejected the People's arguments and held the trial court "did not lack fundamental jurisdiction over the subject matter and the parties" when it heard and decided the defendant's motion under section 1473.7, even though he was still on probation. (*Villalba*, *supra*, 89 Cal.App.5th at p. 670.) " 'When a trial court fails to act within the manner prescribed by [statute], it is said to have taken an ordinary act in excess of jurisdiction. [Citation.] Such "ordinary" jurisdiction, unlike fundamental jurisdiction, can be conferred by the parties' decisions—such as a decision not to object to any perceived deficiency—and so is subject to defenses like estoppel, waiver, and consent.' " (*Id*. at pp. 670–671.) "Given the circumstances, here, including the lack of objection from the prosecutor, the fact that the expiration of [the] defendant's probation was just five months away, allowing that if the prosecutor had objected, the trial court could have either dismissed without prejudice or continued the matter to a suitable time after that. [Citation.] We conclude that public policy supports going forward. We do not discern that the irregularity substantially affected the functioning of the courts, and we find that the prosecutor impliedly consented to the hearing on the premature motion." (*Id*. at p. 671.)

## E. Consideration of Defendant's Motion on Appeal

On appeal, defendant does not seek review of his motion and ineffective assistance arguments under the "common law nonstatutory motion to vacate" that he originally filed because of his custodial status. Instead, he argues this court may review the denial of his motion under the provisions of section 1473.7, subdivision (a)(1). Defendant relies on *Villalba* and asserts he was "in fact entitled to relief under . . . section 1473.7, subdivision (a)(1)" because DHS's custody report stated he was detained by ICE "when his sentence was completed."

In respondent's brief, the People agree defendant was in custody in an ICE facility when he filed his motion to withdraw. The People also state the trial court and the parties followed "the basic standards" of section 1473.7, subdivision (a)(1) at the evidentiary

hearing, and the court analyzed "whether [defendant] understood the immigration consequences of his plea and, if not, whether there was prejudice." The People have not contested defendant's argument that the denial of his motion should be reviewed under section 1473.7.

We thus review the trial court's ruling on defendant's motion under the provisions of section 1473.7.

Defendant's actual custody status at the time he filed his motion to withdraw is not clear from the record. On November 21, 2019, he was sentenced to two years for assault with a deadly weapon plus three years for the great bodily injury enhancement, for an aggregate term of five years, with 277 days of total credits. At the evidentiary hearing, Green testified that he believed defendant would have been "at least eligible for parole once he did the two years. I don't believe that happened. . . . [B]ut it does appear that he must have done the whole five years . . . ."

The record suggests defendant was about to be released on parole when he was taken into ICE custody. DHS's custodial report states that on August 24, 2023, while defendant was still in CDCR custody, DHS Form I-247A was lodged with CCI Tehachapi by a DHS deportation officer. Form I-247A is an "immigration detainer." (*Gonzalez v. United States Immigration and Customs Enforcement* (9th Cir. 2020) 975 F.3d 788, 798–799 & fn. 3; see 8 C.F.R. § 287.7.) "An immigration detainer notifies a state or locality that ICE intends to take custody of a removable alien when the alien is released from that jurisdiction's custody. ICE issues the detainer to request that the state or locality cooperate by notifying ICE of the alien's release date and by holding the alien for up to 48 hours—which is based on ICE's determination that . . . it has probable cause that the alien is removable." (*Lopez-Lopez v. County of Allegan* (W.D. Mich. 2018) 321 F.Supp.3d 794, 797.)

On November 22, 2023, defendant was still at CCI Tehachapi when a DHS deportation officer personally served him with an arrest warrant and notice of the

deportation hearing. On the same day, defendant was taken into custody by ICE's enforcement and removal operations "upon his release from CCI." On December 26, 2023, defendant filed his motion to withdraw.

We will assume without finding that defendant was taken into ICE custody as he was about to be released from CDCR on parole on his criminal conviction, and he continued to be on parole when he filed his motion to withdraw one month later. In such circumstances, the trial court did not lack subject matter jurisdiction to consider his motion under the provisions of section 1473.7, subdivision (a)(1).

Any irregularities did not substantially affect the functioning of the trial court, and "public policy supports going forward" (*Villalba*, *supra*, 89 Cal.App.5th at p. 671) to review the denial of defendant's motion pursuant to section 1473.7, subdivision (a)(1). (See *Villalba*, *supra*, 89 Cal.App.5th at pp. 670–671.) The completion of defendant's parole in his criminal case was, at most, just months away.[25] If the prosecutor raised a custody objection, the trial court could have either dismissed the motion without prejudice or continued the matter to a suitable time. (*Villalba*, at p. 671.)

In part III., *post*, we will review the denial of defendant's motion, including his ineffective assistance claims, based on the provisions of section 1473.7, subdivision (a)(1).

## II. DEFENDANT'S RELIANCE ON SECTION 1016.5

Defendant's motion alleged he should be allowed to withdraw his plea because the trial court failed to comply with section 1016.5 and failed to expressly advise him of the immigration consequences at the plea hearing.

On appeal, defendant acknowledges he signed the felony advisement and waiver of rights form that stated the section 1016.5 advisement, but asserts that at the plea

---

[25] At the 2019 sentencing hearing, the trial court awarded defendant 277 days of credit, which constituted approximately nine months.

41.

hearing, the trial court still had the duty to restate the advisement and warning about the immigration consequences. Defendant separately argues the section 1016.5 advisement on the plea form was insufficient, and did not satisfy defense counsel's affirmative duty to advise him of the immigration consequences.

## A. Section 1016.5

Section 1016.5, subdivision (a) requires a trial court, before accepting a plea of guilty or no contest, to explain to a defendant that if the defendant is not a citizen of this country, conviction of the charged offense " 'may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization . . . .' " (*People v. Arriaga* (2014) 58 Cal.4th 950, 957.)

Section 1016.5, subdivision (b) "provides a remedy for a noncitizen defendant who is not advised of these consequences: 'If . . . the court fails to advise the defendant as required by this section and the defendant shows that conviction of the offense to which [the] defendant pleaded guilty or nolo contendere may have the consequences for the defendant of deportation, exclusion from admission to the United States, or denial of naturalization . . . the court, on [the] defendant's motion, shall vacate the judgment and permit the defendant to withdraw the plea of guilty or nolo contendere, and enter a plea of not guilty.' " (*People v. Arriaga*, *supra*, 58 Cal.4th at p. 957.)

"To prevail on a motion to vacate under section 1016.5, a defendant must establish that (1) he or she was not properly advised of the immigration consequences as provided by the statute; (2) there exists, at the time of the motion, more than a remote possibility that the conviction will have one or more of the specified adverse immigration consequences; and (3) he or she was prejudiced by the nonadvisement." (*People v. Totari*, *supra*, 28 Cal.4th at p. 884; see *Martinez*, *supra*, 57 Cal.4th at pp. 562–563.)

"Nothing in section 1016.5 requires more than an advisement of the three major consequences of a plea that are specified in subdivision (a)," being deportation, exclusion

from admission to the United States, or denial of naturalization. (*People v. Arendtsz* (2016) 247 Cal.App.4th 613, 618–619 (*Arendtsz*).)

Section 1016.5 does not require an oral admonition. A validly executed change of plea and waiver form that fully states the section 1016.5 advisement is a proper substitute for a trial court's verbal admonishment. (*People v. Olvera*, *supra*, 24 Cal.App.5th at p. 1116; *Ramirez*, *supra*, 71 Cal.App.4th at pp. 521–522.)

"So long as the advisements are given, the language of the advisements appears in the record for appellate consideration of their adequacy, and the trial court satisfies itself that the defendant understood the advisements and had an opportunity to discuss the consequences with counsel, the legislative purpose of section 1016.5 is met." (*Ramirez*, *supra*, 71 Cal.App.4th at p. 522.) "Substantial compliance is all that is required." (*People v. Araujo* (2016) 243 Cal.App.4th 759, 762.)

A defendant is fully advised of the immigration consequences as required by section 1016.5 if told that his or her plea *will result* in deportation, exclusion from admission, and denial of naturalization. (*People v. Bravo* (2021) 69 Cal.App.5th 1063, 1072–1073; *Arendtsz*, *supra*, 247 Cal.App.4th at pp. 617–619; *People v. Araujo*, *supra*, 243 Cal.App.4th at pp. 762–763.)

On appeal, we review the trial court's denial of a motion to vacate under section 1016.5 for abuse of discretion. (*Arendtsz*, *supra*, 247 Cal.App.4th at p. 617.)

**B. Analysis**

"[S]ection 1016.5 relief is available only if the trial court failed to provide the statutory advisement or if the record is silent on that subject; in the vast majority of cases the defendant will have been adequately advised and the record will reflect that the advisement was given." (*Martinez*, *supra*, 57 Cal.4th at p. 565.)

Such is the situation in this case. To the extent defendant's motion to withdraw was based on section 1016.5, his arguments are meritless because he failed to establish the first requirement for relief, that he was not fully advised of the immigration

43.

consequences as required by subdivision (a).  Defendant initialed the paragraph in the felony advisement and waiver of rights form that stated more than what was required by section 1016.5:  "I understand that if I am not a citizen, my guilty or no contest plea *will result* in my deportation (removal), exclusion from admission to the United States, and denial of naturalization."  (Italics added.)

Contrary to defendant's arguments, the full written advisement in the plea form was a valid substitute for the trial court's verbal admonishment.  Moreover, the written advisement was not phrased in conditional language, but expressly stated that if he was not a citizen, his plea "will result" in deportation, exclusion from admission, and denial of naturalization.  There was more than substantial compliance with section 1016.5, subdivision (a), and his motion was properly denied on this issue.

## III.  DEFENDANT'S RELIANCE ON SECTION 1473.7

Even if a defendant is advised consistent with section 1016.5, subdivision (a) that he " 'will' be deported [as a result of his plea, such an advisement] does not substitute for the advice of counsel, and it is not a categorical bar to relief" under section 1473.7, subdivision (a)(1).  (*People v. Manzanilla* (2022) 80 Cal.App.5th 891, 906 (*Manzanilla*).)  We thus turn to defendant's reliance on this statute to argue that the trial court should have granted his motion to withdraw his plea.

## A.  Section 1473.7

Section 1473.7 states in relevant part:

"(a)  A person who is no longer in criminal custody may file a motion to vacate a conviction or sentence [if]:  [¶]  (1) The conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence. A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel."

"The defendant must first show that he did not meaningfully understand the immigration consequences of his plea.  Next, the defendant must show that his

44.

misunderstanding constituted prejudicial error. '[P]rejudical error . . . means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.' " (*Espinoza*, *supra*, 14 Cal.5th at p. 319.)

"Prejudicial error may result from 'the moving party's *own* mistake of law or inability to understand the potential adverse immigration consequences of the plea.' [Citations.] At the heart of the prejudicial error analysis 'is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken.' " (*People v. Lopez* (2022) 83 Cal.App.5th 698, 713–714 (*Lopez*); accord, *Benitez-Torres*, *supra*, 112 Cal.App.5th at p. 1262.)

"A defendant's assertion as to his or her state of mind is not accepted at face value by courts evaluating a section 1473.7 motion." (*Carrillo*, *supra*, 101 Cal.App.5th at p. 17; see *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 664 (*Abdelsalam*).) "A defendant must provide ' " 'objective evidence' " ' to corroborate factual assertions. [Citation.] Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*Espinoza*, *supra*, 14 Cal.5th at p. 321.) A defendant is not "required to submit contemporaneous documentation from the time of the plea," but the inquiry under section 1473.7 "requires consideration of the 'totality of the circumstances,' which necessarily involves case-by-case examination of the record [citation], and no specific kind of evidence is a prerequisite to relief. . . . [T]he burden rests with the defendant to establish entitlement to relief. In addition to submitting declarations, both parties are entitled to request an evidentiary hearing. [Citation.] The more robust and inclusive a record, the greater the opportunity for effective persuasion and meaningful judicial review. And the inquiry into a defendant's state of mind may often involve the weighing of credibility and circumstantial evidence." (*Espinoza*, at p. 325.)

"To determine whether there is a reasonable probability a defendant would have rejected a plea offer if he had understood its immigration consequences, courts must 'consider the totality of the circumstances.' [Citation.] 'Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.' [Citations.] Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial. [Citation.] These factors are not exhaustive, and no single type of evidence is a prerequisite to relief." (*Espinoza*, *supra*, 14 Cal.5th at pp. 320–321.)

"We apply independent review to evaluate whether a defendant has demonstrated a reasonable probability that he would have rejected the plea offer had he understood its immigration consequences. [Citation.] ' "[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." ' " (*Espinoza*, *supra*, 14 Cal.5th at pp. 319–320.)

"[T]he inquiry into a defendant's state of mind may often involve the weighing of credibility and circumstantial evidence." (*Espinoza*, *supra*, 14 Cal.5th at p. 325.) "When courts engage in independent review, they must give deference to the trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [trial court] heard and observed.' " ' [Citation.] But when the trial court's findings 'derive entirely from written declarations and other documents,' the trial court and the reviewing court ' "are in the same position," ' and no deference is owed." (*Espinoza*, at p. 320.)

"[A] finding of ineffective assistance of counsel under the Sixth Amendment is not required for [a defendant] to prevail in a section 1473.7 motion. 'The Legislature has clarified that the moving party need not establish ineffective assistance of counsel. [Citation.] It follows therefore, that even if the motion is based upon errors by counsel,

46.

the moving party need not also establish a Sixth Amendment violation as by demonstrating that "counsel's representation 'fell below an objective standard of reasonableness' " . . . " 'under prevailing professional norms,' " as stated in *Padilla* . . . .' " **(*Benitez-Torres*, *supra*, 112 Cal.App.5th at pp. 1267–1268.)** In such a situation, the defendant is " 'required only to show that one or more of the established errors were prejudicial and damaged his "ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of [his] plea . . . ." ' " (*Id.* at p. 1268; see *People v. Padron* (2025) 109 Cal.App.5th 950, 960–961 (*Padron*).)

## B.  The Trial Court's Findings Are Supported by the Record

Our independent review demonstrates that defendant did not carry his burden under section 1473.7, subdivision (a)(1) to show his prejudicial subjective error to permit withdrawal of his plea.  There is substantial evidence to support the trial court's finding that Green's testimony was credible.  We also find George's testimony and defendant's declaration are refuted by the record.

As explained above, defendant initialed the paragraph in the felony advisement and waiver form, that went beyond the language required by section 1016.5, and stated that if he was not a citizen, his plea "will result" in deportation, exclusion from admission to the United States, and denial of naturalization.

As defendant notes, compliance with the section 1016.5 advisement does not categorically bar relief under section 1473.7, where there is "contemporaneous evidence to the contrary" that shows the moving party's own subjective error about the immigration consequences of his plea.  (*Manzanilla*, *supra*, 80 Cal.App.5th at p. 910.) For example, in *Manzanilla*, there was evidence to support the defendant's section 1473.7 motion because defense counsel told the defendant "that his plea would '[change] his status [and] he [would] have [an] immigration hearing' " (*Manzanilla*, at p. 905), and the defendant told the trial court that he did not want to go through with the plea if he was

going to be deported.  (*Manzanilla*, at p. 900.)  In *People v. Curiel* (2023) 92 Cal.App.5th 1160, defense counsel could not recall if he knew the defendant's status or whether the plea would result in immigration consequences, and erroneously advised the defendant that avoiding jail time would avoid adverse immigration consequences like deportation; counsel's statements corroborated the defendant's declaration that she was only told that avoiding jail time would avoid immigration problems, and she was not told the plea would result in deportation.  (*Id*. at pp. 1176–1177.)  In *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), the defendant entered his plea and was sentenced, and then learned a few days later that he could not be admitted to the recommended drug treatment program because he had an immigration hold.  The defendant "promptly sent a series of letters to the court expressing confusion about the situation," and that he would not have pled guilty if he had known that he faced deportation.  (*Id*. at p. 520.)  *Vivar* held objective evidence showed it was reasonably probable the defendant would not have agreed to the plea if he had understood it would result in his imminent deportation.  (*Id*. at p. 517.)

In contrast, the record herein fails to establish such corroborative evidence about defendant's alleged subjective error at the time of his plea regarding the immigration consequences.  At the plea hearing, Green stated to the trial court, in defendant's presence, that he "th[o]roughly advised" defendant of the immigration consequences after consulting with Castaneda, that defendant "*should have grave concerns about potential deportation as a result of this plea*.  I've explained that to him.  I've also explained to him that I believe that he may prevail at trial.  There are, in fact, defense issues, but at the same time, his exposure in this case is 10 years, six months.  *And in light of all that, [defendant] tells [me] [he] still wants to proceed and take this plea and agree to this disposition*."  (Italics added.)

The trial court asked defendant if Green's statements were correct, he understood the immigration consequences, he had a "thorough discussion" of those consequences with Green, and he still wanted to go through with the plea.  Defendant said yes to each

question. When asked if he had any remaining questions, defendant said he was "clear on everything."

Despite the express and unambiguous advisements in the felony advisement and waiver form, and the trial court's specific discussion with defendant and his acknowledgements at the plea hearing, defendant's supporting declaration was limited to the following paragraph to explain his alleged subjective error:

> "If I had known the severe immigration consequences that came with the conviction, I would have bargained for a plea that would not lead to my deportation. I would have done everything I could to protect my immigration rights. Including pleading up to a more serious charge, waiving time credits, or taking a felony strikes [*sic*]."

Defendant argues his supporting declaration was "unrefuted," it was corroborated by the record, and shows he was "unaware of the severity of the consequences he faced."

"Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." (*Lee v. United States* (2017) 582 U.S. 357, 369; see *Espinoza*, *supra*, 14 Cal.5th at p. 321.) Defendant's declaration is clearly undermined by the record. Defendant did not address whether or why he did not understand what the trial court and his attorney said at the plea hearing. He did not explain why he responded affirmatively when the court asked if he read and understood the advisement in the change-of-plea form, thoroughly discussed the immigration consequences with Green, understood his advisements, and that he faced "grave" immigration consequences as a result of the prosecution's plea offer. Indeed, defendant's declaration is contrary to everything that was said by the court, Green, and defendant himself at the plea hearing.

At the evidentiary hearing, George testified he spoke with Green, and claimed Green did not tell him about the immigration consequences if defendant entered into the plea, and Green instead said defendant was going to trial. George testified he was "ignorant of what was going on, and we were just knowing that he was in the court

system. So we didn't know exactly what was going on and what were going to be the consequences for him."

Both defendant's declaration and George's testimony about the nature and extent of Green's advisements were undermined by Green's extensive and detailed testimony about what he said to both defendant and George. Green testified he spoke to defendant's parents "throughout the proceedings and where we were at and what was going on and what the offers were and my concerns about immigration. And mostly, I spoke to . . . father, but I did talk to his mother as well. And I believe . . . father understood everything as well." Green's case notes confirm he spoke to defendant's parents at least twice.

" 'When the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen that pending criminal charges may carry a risk of adverse immigration consequences.' [Citation.] However, where the law is 'succinct, clear, and explicit' that the conviction renders removal virtually certain, counsel must advise his client that removal is a virtual certainty." (*U.S. v. Rodriguez-Vega* (9th Cir. 2015) 797 F.3d 781, 786; see *Manzanilla*, *supra*, 80 Cal.App.5th at p. 905.) "A criminal defendant who faces almost certain deportation is entitled to know more than that it is *possible* that a guilty plea could lead to removal; he is entitled to know that it is a *virtual certainty*." (*U.S. v. Bonilla* (9th Cir. 2011) 637 F.3d 980, 984, second italics added.)

Defendant was not told it was merely possible he could be deported. Green testified that after consulting with Castaneda, he spoke to defendant and "made it pretty clear to him that if he resolved this case for a strike where he went to prison, *he would almost certainly get deported*." (Italics added.) "I thought I made it clear to him that he had severe immigration consequences to be concerned about . . . ."

Green could not say "to a moral certainty" that defendant understood his advice about the immigration consequences of the plea, but testified that "I told him, yes, you

50.

would most likely get deported if you make this deal. I do believe I advised him of that." Green further testified "perhaps I should have been more concerned and more emphatic with [defendant] that this could be a bigger problem," but "I thought he understood that. Maybe he did not. Maybe he did not fully understand just how severe this could be. But I mean, he did understand, I believe, the benefits of this deal versus what would happen if he went to trial and lost."

Green was asked whether he formed the opinion that defendant understood that he was "almost certainly going to get deported" (boldface omitted) if he took the plea offer. Green testified: "I believe he did. And I also believe that he understood that I was willing to do this trial, and . . . prevailing at the trial was really the only way he could say with any sort of certainty that he would not get deported."

In closing argument at the evidentiary hearing, defendant's counsel acknowledged that defendant "was advised properly that this conviction was a deportable offense," and Green "was correct when he said that there are grave consequences, because that is true." On appeal, defendant also acknowledges the record shows he was told that deportation was a strong likelihood, but asserts Green failed to tell him that he was pleading to "an aggravated felony under federal immigration law and of the consequences of conviction of an aggravated felony." A similar argument about the specific nature of the advisement was rejected in *People v. Tapia* (2018) 26 Cal.App.5th 942, disapproved on other grounds by *Carrillo*, *supra*, 101 Cal.App.5th at page 13, footnote 6, where the trial court held "[w]hether the offense to which [the defendant] pled is classified by the federal government as an aggravated felony is not a consequence of the plea; it is simply a legal classification for certain offenses. The consequence of the plea is that the charge to which [the defendant] pled would lead to his deportation and would bar him from reentry if he left the United States, and [the defendant] was advised of these consequences." (*Tapia*, at p. 953.)

As noted by the People, the only contemporaneous evidence of defendant's intent at the time of the plea was stated in Green's case notes for October 4, 2019, the day of the plea, that defendant "does not want to go to CDC[R] on a [section] 273a," child abuse, as charged in count 1 of the first amended information. In his reply brief, defendant acknowledges this statement was in Green's case notes, but argues there is no evidence that this subject was defendant's own personal concern. Instead, he points to Green's testimony at the evidentiary hearing, that the child abuse charge "create[s] red flags in the prison system. If people find out that's what you're locked up for, that puts you in a more dangerous position."

Defendant concludes Green was the only person concerned about the child abuse charge. However, Green's testimony was not inconsistent with his case notes since he could have shared defendant's concern about being imprisoned on a child abuse conviction. Defendant filed the entirety of Green's case notes in support of his motion to withdraw, yet defendant's declaration did not dispute the statement that he did not want to go to prison on a child abuse conviction.

The record in this case is somewhat similar to that reviewed in *Abdelsalam*, *supra*, 73 Cal.App.5th 654, where the defendant's declaration in support of his section 1473.7 motion stated he was not aware of the immigration consequences of his plea, but the trial court found that declaration was undermined by the record. (*Abdelsalam*, at pp. 663–664.)

> "During the taking of the plea, [the defendant] was told orally and in writing that he *will* be deported. Not that he 'might' be deported, or that he 'could' be deported. [The defendant's] argument that he was not aware of the mandatory nature of the deportation flies in the face of the mandatory language used to describe the likelihood of deportation. [The defendant] is not entitled to simply ignore the admonitions he was given about the consequences of the plea, and argue that he unilaterally assumed he would be treated in direct contravention of what he was advised orally and in writing." (*Abdelsalam*, *supra*, 73 Cal.App.5th at p. 663.)

In this case, the trial court found Green's detailed testimony was credible on exactly what he advised defendant about the immigration consequences of pleading to assault with a deadly weapon, when compared to defendant's declaration and George's testimony: "I'm just not convinced that he didn't know anything or didn't know the proper procedure, didn't know anything about immigration consequences. He was totally and thoroughly advised in that basis."

The trial court's factual findings as to Green's hearing testimony is supported by substantial evidence. Defendant failed to carry his burden under section 1473.7, subdivision (a)(1), and Green provided affirmative and competent advice as contemplated by *Padilla* and section 1016.3. (See, e.g., *Carrillo*, *supra*, 101 Cal.App.5th at pp. 17–18.)

## IV. COUNSEL'S ALLEGED FAILURE TO NEGOTIATE OR ADVISE ABOUT IMMIGRATION-NEUTRAL PLEAS

We separately address defendant's renewed arguments about Green's alleged failure to negotiate an immigration-neutral plea. Defendant stated in his supporting declaration that if he had "known the severe immigration consequences that came with the conviction, I would have bargained for a plea that would not lead to my deportation. I would have done everything I could to protect my immigration rights. Including pleading up to a more serious charge, waiving time credits, or taking a felony strikes [*sic*.]."

On appeal, defendant concedes Green attempted to obtain a plea agreement with a probationary disposition because he believed that would eliminate immigration consequences. However, defendant argues Green failed to negotiate a plea agreement for immigration-neutral offenses, and failed to advise defendant that such pleas existed in this case. Defendant argues Green's failure to advise led to his own prejudicial error about his options when he considered the district attorney's plea offer, and it is reasonably probable he would have rejected the prosecution's plea offer if he had known about possible immigration-neutral pleas, and gone to trial.

## A. Immigration-neutral Pleas

In ascertaining prejudicial error under section 1473.7, we consider "whether alternative, immigration-safe dispositions were available at the time of the defendant's plea. Factors relevant to this inquiry include the defendant's criminal record, the strength of the prosecution's case, the seriousness of the charges or whether the crimes involved sophistication, the district attorney's charging policies with respect to immigration consequences, and the existence of comparable offenses without immigration consequences." (*Espinoza*, *supra*, 14 Cal.5th at p. 323; accord, *Padron*, *supra*, 109 Cal.App.5th at p. 964.)

"A decision to reject a plea bargain . . . 'might be based either on the desire to go to trial or on the hope or expectation of negotiating a different bargain without immigration consequences.' [Citation.] When a court weighs whether a defendant would have taken the latter path, it need not decide whether the prosecution would actually 'have offered a different bargain'—rather, the court should consider 'evidence that would have caused *the defendant* to expect or hope a different bargain would or could have been negotiated.' " (*Vivar*, *supra*, 11 Cal.5th at p. 529, original italics; accord, *People v. Curiel*, *supra*, 92 Cal.App.5th at p. 1180.)

Whether a defendant "could have secured a more favorable plea deal or prevailed at trial does not conclusively determine whether he established prejudice under section 1473.7. Rather, ' "[c]ommon sense . . . recognizes that there is more to consider than simply the likelihood of success at trial. The decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea." ' [Citation.] For this reason, 'relief should be granted if the court . . . determines the defendant would have chosen not to plead guilty or nolo contendere, even if the court also finds it not reasonably probable the defendant would thereby have obtained a more favorable outcome.' " (*Padron*, *supra*, 109 Cal.App.5th at p. 964.)

**B. Evidence About Possible Immigration-neutral Pleas**

Defendant relies on Longoria's declaration and Castaneda's hearing testimony to argue there were possible pleas available for immigration-neutral offenses that were felony strikes, factually supported, and would have met the prosecution's insistence for a custodial term. In reviewing this issue, however, there are problems with defendant's reliance on some of the immigration-neutral offenses and whether they could have been applicable in this case.

### *Burglary*

In his motion to withdraw his plea, defendant asserted that "commercial burglary" was an immigration-neutral plea in this case, based on Longoria's declaration on that point. At the evidentiary hearing, Castaneda generally testified that burglary was an immigration-neutral plea, but she did not address the facts of defendant's case. Also at the hearing, Green was asked whether he attempted to negotiate a plea for "residential burglary," and said no.

In defendant's closing argument, Longoria asserted Green could have negotiated for "residential burglary" and Longoria further stated: "I went to the location of the area. [Defendant] could have gotten charged with a residential burglary." On appeal, defendant again states he could have pled to burglary as an immigration-neutral offense in this case.

In citing both "residential" and "commercial" burglary as possible immigration-neutral offenses, defendant did not explain how *any* type of burglary could have been charged in this case. Burglary "requires an entry into a specified structure with the intent to commit theft or any felony." (*People v. Tafoya* (2007) 42 Cal.4th 147, 170; see *People v. Hendrix* (2022) 13 Cal.5th 933, 939; *People v. Fenderson* (2010) 188 Cal.App.4th 625, 635.)

First degree residential burglary is "reserved . . . for inhabited structures." (*Corona v. Superior Court* (2021) 65 Cal.App.5th 950, 960.) "All other kinds of burglary are of the second degree" (§ 460, subd. (b)), but must still involve a structure. (See § 459.) "A 'building' is defined as 'anything that is built with walls and a roof, as a house, factory, etc.; structure.' [Citation.] A fenced yard is not a building according to common usage." (*People v. Chavez* (2012) 205 Cal.App.4th 1274, 1281–1282.) "When a line of California cases going back almost to the Civil War requires a building to have a roof for purposes of burglary, when the courts of no state with a similar statute have ever held otherwise, and when the dictionary stands shoulder to shoulder with these authorities, it is not for us to say a fenced, uncovered yard can be burglarized." (*Id.* at p. 1283.)

At the preliminary hearing, the two minors gave the only testimony about the location where defendant pulled the knife on them—the minors rode their bicycles to the skate park in Atwater at 9:30 p.m., no one else was around, they ran up and down the ramps, and P.H. was standing on the top of a ramp when defendant pulled the knife on L.S. P.H. testified he jumped down and landed on defendant and they fought on the ground, which he described as being like a metal surface. The probation report simply described the scene of the crime as the "skate park" at "the Osborn Park Area."

Longoria's statement in closing argument, that he went to the skate park and residential burglary was a possible plea, was not based on any evidence introduced at the hearing or contained in this record. There are no photographs of the skate park. There is no evidence the skate park was inside of any type of a structure, much less a residence. Based on the limited record herein, it is impossible to divine how defendant's arrival at a skate park to pull a knife on two minors constituted a burglary.

### *Felony False Imprisonment*

Defendant also states he could have pled to felony false imprisonment "by menace, fraud or deceit," in violation of sections 236 and 237, and it would have been an immigration-neutral conviction.

" 'False imprisonment is the unlawful violation of the personal liberty of another.' [Citation.] . . . 'All that is necessary to make out a charge of false imprisonment, a misdemeanor, is that "the individual be restrained of his liberty without any sufficient complaint or authority therefor, and it may be accomplished by words or acts [together with the requisite intent to confine] which such individual fears to disregard." [Citations.] To raise the offense to a felony, violence or menace, which may or may not be life endangering, or fraud or deceit, which presents no present significant danger to the victim, must be established. [Citation.]' " (*People v. Islas* (2012) 210 Cal.App.4th 116, 122–123.)

As to the elements of felony false imprisonment, " ' "[v]iolence" . . . means . . . " 'the exercise of physical force used to restrain over and above the force reasonably necessary to effect such restraint.' " ' [Citations.] 'Menace' is defined as ' " 'a threat of harm express or implied by word or act.' " ' " (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.)

As explained above, under the Immigration and Nationality Act, a "crime of violence" for which the term of imprisonment is at least one year is an "aggravated felony," and a noncitizen who is convicted of an aggravated felony at any time after admission is conclusively presumed deportable and subject to mandatory removal. (*Sessions v. Dimaya*, *supra*, 584 U.S. at p. 153.)[26]

---

[26] The courts use the "categorical approach" to determine whether a defendant's state conviction is a crime of violence and an aggravated felony. (*Sessions v. Dimaya*, *supra*, 584 U.S. at p. 153; *Tellez-Ramirez v. Garland* (9th Cir. 2023) 87 F.4th 424, 428.) "The categorical approach examines whether the particular state criminal statute under which an offender has been convicted is a 'match' for the 'generic federal offense.'

In *U.S. v. Hernandez-Hernandez* (9th Cir. 2005) 431 F.3d 1212, the defendant filed a motion to set aside his plea in California for felony false imprisonment to prevent his deportation. When he entered the plea, he stipulated to certain facts that gave rise to the conviction. (*Id*. at pp. 1215–1216.)

*Hernandez-Hernandez* held that California's statutory definition of felony false imprisonment "reaches both conduct that constitutes a crime of violence and conduct that does not; therefore, we use the modified categorical approach to examine 'documentation or judicially noticeable facts that clearly establish that the conviction is a predicate conviction for enhancement purposes[,] such as the indictment, the judgment of conviction, jury instructions, a signed guilty plea, or the transcript from the plea proceedings.' " (*U.S. v. Hernandez-Hernandez*, *supra*, 431 F.3d at p. 1217.)

In applying the modified categorical approach, *Hernandez-Hernandez* relied upon the defendant's plea stipulation to find his conviction for felony false imprisonment was a crime of violence under the modified categorical approach. "[The defendant] admitted to

---

[Citation.] To determine whether a state statute is a match for the generic federal offense, 'courts look to the elements of the statute of conviction.' [Citation.] Where a state statute 'sweeps more broadly' than the generic federal offense—i.e., where it criminalizes conduct that is *outside* the generic federal offense—it is generally not a match under the categorical approach. [Citation.] 'The key . . . is elements, not facts.' [Citation.]" (*Godoy-Aguilar v. Garland* (9th Cir. 2025) 125 F.4th 985, 988–989, original italics.)

When the prior conviction is for violating a "divisible" statute, the court may use the "modified categorical approach" to determine if the offense is a crime of violence and an aggravated felony. (*Descamps v. United States* (2013) 570 U.S. 254, 263; see *Tellez-Ramirez v. Garland*, *supra*, 87 F.4th at p. 428.) "A statute is divisible when it lists alternative 'elements,' effectively creating separate crimes, as distinct from listing different means of committing a single crime. [Citations.] ' "Elements" are the "constituent parts" of a crime's legal definition—the things the "prosecution must prove to sustain a conviction." ' [Citations.] If the alternatives are elements, we can review a limited set of documents in the record to find the applicable alternative that was the crime of conviction and then compare that alternative to the generic federal crime." (*Tellez-Ramirez*, at pp. 428–429.) The modified categorical approach does not apply when the prior conviction "has a single, indivisible set of elements." (*Descamps*, at p. 258.)

58.

a particular set of facts that clearly involve violence and the use of force. He positioned his truck to block the path of his victims' van, attempted to pry open the van's door, grabbed one of the victims and attempted to extract her forcibly from the van, and then yanked the wires under the dashboard to disable the victims' vehicle. Finally, he threatened to kill the occupants if they refused to turn over one of the women in the van. This stipulation does not describe activities of fraud or deceit; it describes acts of violence. The conclusion is inescapable that, by stipulating to this testimony as the factual basis for his guilty plea, [the defendant] necessarily was convicted of a crime committed by violent means, and not by the other methods set forth in the charging document and statute." (*U.S. v. Hernandez-Hernandez*, *supra*, 431 F.3d at p. 1218.) "We note that the stipulation to the means [the defendant] used to accomplish the false imprisonment was necessary to his plea. [Citation.] As a result, because [the defendant] was convicted of committing false imprisonment by violence, menace, fraud or deceit, and the factual basis only described violent means, we can conclude that he was convicted of committing the crime through violence." (*Id*. at p. 1218, fn. 7.)

In this case, if defendant had pled to felony false imprisonment, *Hernandez-Hernandez* would have permitted reliance on the modified categorical approach to find his conviction was for an aggravated felony. At the plea hearing, the parties stipulated to the preliminary hearing as the factual basis for the plea, which showed that a felony false imprisonment conviction would have been based on violence or menace. There was thus the possibility that a felony false imprisonment plea may have still resulted in an aggravated felony conviction.

### *Child Abuse and Attempted Robbery*

Defendant complains Green "did not offer a plea to a child abuse charge as an immigration-safe plea." Defendant is presumably referring to the charged offense in count 1 of child abuse in violation of section 273a, subdivision (a). A violation of section 273a has not been adjudicated as an aggravated felony for purposes of federal

immigration law.  (*People v. Bravo*, *supra*, 69 Cal.App.5th at p. 1073, fn. 6; *Ramirez v. Lynch* (9th Cir. 2016) 810 F.3d 1127, 1133–1134.)

At the evidentiary hearing, however, Castaneda was asked if a child abuse conviction in violation of section 273a, subdivision (a) would "fall as an aggravated felony for immigration purposes."  (Boldface omitted.)  She testified that "[i]t would," and such a conviction would be "problematic" if a noncitizen was in immigration court and trying to cancel removal.  Castaneda was also asked if an immigration judge would find a conviction for child abuse with great bodily injury as a "particularly serious crime."  (Boldface omitted.)  She replied, "Most likely, yes."[27]

Defendant was charged in count 2 with attempted robbery, which is defined as an aggravated felony under federal immigration law.  (*U.S. v. Martinez-Hernandez* (9th Cir. 2019) 932 F.3d 1198, 1202, 1205–1207; *U.S. v. Saavedra-Velazquez* (9th Cir. 2009) 578 F.3d 1103, 1110.)

## C.  Green's Testimony About Alternate Pleas

Defendant argues an immigration-neutral plea could have been negotiated in this case.  On the date of the offense defendant was 21 years old, he did not have any juvenile dispositions, and his only prior offense was for driving under the influence, for which he received probation.  Defendant suggests dissuading a witness (§ 136.1) was also an immigration-neutral plea that would have been available in this case.

There is no evidence that any of these possible plea agreements were offered by the People, or within the parties' contemplation or reasonable expectations.  (See, e.g., *Vivar*, *supra*, 11 Cal.5th at p. 531 [prosecutor had already offered plea to burglary, and a

---

[27] "Ordinarily, withholding of removal prevents the removal of a noncitizen to a country where that individual's life or freedom would be threatened because of their race, religion, nationality, membership in a particular social group, or political opinion.  [Citation.]  This relief, however, does not apply to noncitizens who have been convicted of a 'particularly serious crime.' "  (*Chmukh v. Garland* (9th Cir. 2024) 124 F.4th 670, 678.)

plea to the same offense with a lower sentence would have no immigration consequences]; *Manzanilla*, *supra*, 80 Cal.App.5th at pp. 908–909 [prosecutor had already offered plea to offense with 365-day sentence, and a plea to that offense with a 364-day sentence would have no immigration consequences]; *Rodriguez*, *supra*, 68 Cal.App.5th at pp. 305–306, 326 [prosecutor had already offered plea to two drug offenses, and a plea to one of them would have no immigration consequences].)

Green testified the prosecutor considered the charged offenses to be serious crimes because of the knife wounds defendant inflicted to the minor's shoulder and head, and the prosecutor would not accept a plea unless it was for a felony strike offense, a great bodily injury enhancement, and a prison term. "I can't force the prosecution to make an offer that's going to be immigration friendly if they think the case is serious enough to merit prison and a strike. That's what the trials are for. And I was prepared to do the trial."

"[LONGORIA:] Was there any research to see whether he could still take a GBI enhancement with the statute that's immigration safe?

"[GREEN:] Not that I recall, *but my information was if he took [the] GBI enhancement and went to prison, as I said, he would most likely get deported, and that's what I told him.*

"[LONGORIA:] And that's based on the information that he got from . . . Castaneda?

"[GREEN:] Yes, and from other training I've had on immigration consequences." (Boldface omitted, italics added.)

Green testified, "I can say just from my professional experience and looking over this case again, that the deal we reached was about as good as could realistically be expected, given my experience with the District Attorney's Office of Merced County."

Defendant asserts Green could have structured an immigration-neutral plea that "would have met the prosecution's objectives for a sentence longer than one year and more serious charges given the circumstances of the offense." This argument misstates Green's testimony, which constituted the only evidence of the district attorney's offer—

61.

that the plea agreement had to consist of a felony strike offense, a great bodily injury enhancement, and a prison term.

Defendant responds there is nothing in the record to show "a plea bargain to an immigration-safe felony, even if it was a strike, with a great bodily injury enhancement, would have detrimental immigration consequences. Castaneda did not testify to this. *It is true that the safer plea bargains proffered at the hearing did not include such enhancement*; however, there were certainly plea bargains that would have allowed for a felony disposition, a comparable sentence, and a strike." (Italics added.)

Defendant's suggestions about "a comparable sentence" that lacked the great bodily injury enhancement is contrary to Green's undisputed testimony about the prosecutor's plea conditions in this case, and what he was told by Castaneda: if defendant "took [the] GBI enhancement and went to prison, as I said, he would most likely get deported, and that's what I told him."

Castaneda only testified generally about immigration-neutral offenses and not specifically about the facts in this case. While she had practiced law in Merced County, she did not offer an opinion to contradict Green's testimony about whether the district attorney's office would have been amenable to a plea agreement for one of the possible immigration-neutral offenses without a great bodily injury enhancement, given the facts of this case.

Finally, in his supporting declaration to the motion to withdraw, Longoria listed possible immigration-neutral pleas as discussed above, but did not address whether the district attorney would have accepted one of these pleas. In his closing argument at the evidentiary hearing, Longoria inferred that perhaps the opposite was true when he stated: "[B]efore we file[d] this motion, or I think shortly thereafter, we did reach out to the People regarding trying to do no opposition to this plea and doing two felony strikes [that] would be even more reasonable. There's ways to resolve this case that were there."

62.

The district attorney's office, however, vigorously opposed defendant's motion to withdraw.

"[T]here is no evidence in the record that an immigration-safe plea . . . would have been offered by the prosecution . . . ." (*Carrillo*, *supra*, 101 Cal.App.5th at pp. 21–22; see *People v. Garcia* (2022) 79 Cal.App.5th 1059, 1066.) Similarly, there is no evidence in this record that an immigration-neutral plea, even if proposed by Green, would have been offered or accepted by the prosecution, and the evidence does not demonstrate defendant was erroneously advised on this subject.

## D. Defendant's Decision Not To Go to Trial

Defendant asserts that if Green had correctly advised him of the immigration consequences and the existence of immigration-neutral pleas, he could have "rationally decided to proceed to trial in order to avoid an aggravated felony conviction" because "he had a triable case. [Citation.] Even if the chance of acquittal was remote, [defendant] would have rationally chosen to proceed to trial rather than accept a disposition that would definitely result in an order of deportation and loss of residency."

When there is evidence that "avoiding deportation was *the* determinative factor" for a defendant, it would be reasonably probable that he "would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a 'Hail Mary' at trial." (*Lee v. United States*, *supra*, 582 U.S. at pp. 367–368.)

Defendant was presented with the opportunity to reject the plea offer and go to trial, and declined to do so. Green testified he advised defendant about the plea offer and Castaneda's opinion that he would almost certainly be deported. Green believed they were still going to trial. However, defendant said he wanted to take the plea offer. Green vacated the trial date and continued the matter so he could "double check with [defendant] and make sure he understood everything before we proceeded." Even after

this additional consultation, defendant still said he wanted to take the plea offer.[28] Defendant did not introduce any evidence to refute Green's testimony on this point.

## V. DEFENDANT'S EVIDENCE ABOUT TIES TO THE UNITED STATES

Defendant argues that evidence of his family ties to the United States corroborates his supporting declaration and prejudicial error arguments, because he has strong ties to the United States, he fled a country in which he risked persecution and possible torture as a child, he was a minor when he entered the country, he attended public school, he is a legal permanent resident, his parents and other close family reside in the United States, and he is "currently doing his best to defend himself against removal."

### A. Evidence of Family and Community Ties

As explained by the Supreme Court, "[t]ies to the United States are an important factor in evaluating prejudicial error under section 1473.7 because they shed light on a defendant's immigration priorities. . . . Depending on the strength of a defendant's community ties, 'the prospect of deportation' may be . . . ' "the most important part" ' of the defendant's 'calculus in responding to certain criminal charges.' " (*Espinoza*, *supra*, 14 Cal.5th at p. 321.) "Community ties may be established by length of residence; immigration status; lack of connection to the country of origin; connections to family, friends, or the community; work history or financial ties; or other forms of attachment." (*Ibid*.; see *Vivar*, *supra*, 11 Cal.5th at p. 530.) "Objective evidence of a defendant's community ties includes facts provided by a defendant's declaration or declarations from

---

[28] The record supports Green's testimony on this point. On July 16, 2019, the court conducted the trial readiness conference, defendant's jury trial was continued to September 17, 2019, and Green's case notes state: "Offer is 5 years CDC[R]. Not much of an offer given [defendant's] lack of record." (Boldface omitted.) On September 5, 2019, the trial court held the readiness conference, and Green's case notes state: "Can settle this for [section] 245[, subdivision ](a)(1) with GBI enhancement." After additional continuances, the plea hearing was held on October 4, 2019. After the plea, Green obtained another continuance before the sentencing hearing "for further discussion with the defendant regarding immigration."

family members, friends, colleagues, community members, or other acquaintances." (*Espinoza*, at p. 321.)

"[W]hen a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with ' "objective evidence." ' " (*Vivar*, *supra*, 11 Cal.5th at p. 530.) " '[T]he more robust and inclusive a record, the greater the opportunity for effective persuasion and meaningful judicial review' of a section 1473.7 motion." (*Carrillo*, *supra*, 101 Cal.App.5th at p. 7, fn. 2.)

In *Vivar*, the Supreme Court found the defendant's substantial ties to the United States were an important factor in support of granting relief because he was "brought to this country at age six . . . , and he attended schools, formed a family, and remained here for 40 years." (*Vivar*, *supra*, 11 Cal.5th at p. 530.) "At the time of his plea, he had two children, two grandchildren, and a wife, all of whom are citizens and all of whom resided in California. . . . [The defendant] had virtually no ties to Mexico, spoke Spanish 'like an American,' and found it 'difficult to function in Mexican society because people treat [him] like an outsider.' " (*Ibid*.) Such facts provided objective evidence of the defendant's "concern about the immigration consequences of his plea options," supporting a finding of prejudicial error. (*Ibid*.)

In *Espinoza*, the defendant "spent most of his life in the United States. He came to California when he was 13 years old. At the time of the plea, [the defendant] had lived in California for 23 years. His wife and five children were United States citizens. His parents and siblings lived in the United States. He was the financial provider for his family. As [the defendant] puts it, '[e]verything important in his life' at the time he entered his plea 'was in the United States.' [Citation.] [The defendant's] deep and long-standing ties are undisputed and weigh in favor of finding that he would have considered immigration consequences to be of paramount concern in deciding whether to accept a plea agreement." (*Espinoza*, *supra*, 14 Cal.5th at p. 322.)

In *Lopez*, *supra*, 83 Cal.App.5th 698, the defendant, a lawful permanent resident, pled to second degree robbery for a two-year sentence. At the plea hearing, the prosecutor stated if the defendant was not a citizen, his conviction " 'may result' " in being deported, and the defendant said he understood. (*Id*. at p. 705.) In support of his section 1473.7 motion to vacate, the defendant filed a declaration stating that his own lawyer never asked about his immigration status, and he believed he would not be subject to any immigration consequences because he assumed that, in the absence of any advice from his counsel, his status as a lawful permanent resident shielded him from any possible adverse immigration consequences mentioned by the prosecutor at his plea hearing. (*Lopez*, at pp. 712–713.)

The defendant in *Lopez* submitted extensive evidence in support of his motion to vacate, that he was 22 years old at the time of the offenses, he did not have a prior criminal record, and he had a stable employment and residential history over the preceding five years. (*Lopez*, *supra*, 83 Cal.App.5th at p. 705.) He came to the United States when he was 13 years old, he completed middle school and high school in the United States, he was a lawful permanent resident, he had no ties to his nation of birth, and remained in this country until he was deported. (*Id*. at p. 706.) His employer submitted a letter stating that the defendant was a diligent worker and an excellent employee, and offering to sponsor him as an immigrant worker. He submitted letters from several members of his family, attesting to his good character, his deep roots in the United States, close ties to his family in this country, and he was a father figure to young members of his family who lacked a father. The defendant's evidence was unrefuted. The trial court denied the defendant's motion to vacate. (*Id*. at pp. 708–709.)

*Lopez* reversed the trial court's order and held the defendant's evidence and the record of the plea hearing established his own subjective error about immigration consequences at the time of his plea. (*Lopez*, *supra*, 83 Cal.App.5th at pp. 713, 719.) As to prejudice, *Lopez* held the defendant corroborated his assertions with objective

66.

evidence. (*Id*. at p. 715.) "[The defendant's] declaration in support of the motion to vacate contains a detailed account of his strong ties to the United States, which is corroborated by the letters from his family and his former employer. When he was 13 years old, [the defendant] was brought to Los Angeles along with his four siblings by his mother after the death of his father. He became a father figure and assumed responsibility for his younger siblings as the close-knit family established itself in its new home. Even as a teenager, [the defendant] helped to support his mother and continued to do so until he was deported in 2016. [¶] [The defendant] completed middle school and high school in Los Angeles. During those years he became a lawful permanent resident of the United States, and considered himself to be an American. Everyone in his family is now a United States citizen." (*Ibid*.) "In contrast to his strong ties to the United States, [the defendant] has no ties to Mexico. He has suffered from the lack of family, friends and employment since he was deported in 2016, and his absence has caused considerable hardship for his family." (*Id*. at p. 716.)

**B. Defendant's Declaration and Other Information**

Defendant waived his presence at the evidentiary hearing and filed one supporting declaration in support of his motion. Aside from stating that he was a citizen of Cameroon, defendant's sparse declaration did not address when or how he entered the United States, his current legal status, the nature and extent of his ties to the community, or other relevant factors to establish prejudice as set forth in *Espinoza*, *Vivar* and *Lopez*.

Also, in support of his motion, defendant filed DHS's custodial report that summarized an unsworn interview with him in 2023, when he was still in CDCR and shortly before he was taken into ICE custody. In that report, defendant was quoted as saying his status was adjusted when he was 17 years old to being a lawful permanent resident in 2014, his mother was a naturalized citizen, and his father was an asylee applicant. Defendant did not claim any gang affiliation. Defendant "claim[ed] fear of persecution or torture" if he was deported to Cameroon.

On appeal, defendant cites to information in the 2019 probation report as the basis to establish his ties to the United States. The probation report summarized defendant's statements to the probation officer in 2019—that he was living with his parents, both parents were employed, he had three younger siblings who were still in school, he had never been married, he was not in a relationship, and he did not have children. According to the probation report, defendant graduated from high school in Los Banos in 2015, he took general education classes at Merced College from 2016 to 2018, and had the goal of obtaining an associate's degree in business administration. He admitted prior, occasional alcohol and marijuana use. Defendant said he was unemployed and did not disclose any prior work experience. His future plans were to get his degree in business administration, get back to playing football, transfer to another college, and " '[t]ake care of my folks.' "

## C. Analysis

At the hearing on defendant's motion to vacate, the evidence before the trial court about defendant's ties and personal life was limited to his sparse declaration, his father's testimony about the family's entry based on his grant of asylum, and the information in DHS's 2023 detention report filed as an exhibit to his motion. The 2019 probation report was not filed as a supporting exhibit to defendant's motion to withdraw. While it is part of the record on appeal, it is not clear whether the probation report was before the trial court when it considered defendant's motion to vacate his conviction.

In contrast to *Lopez*, defendant's supporting declaration did not address his background and life in the United States, and exactly what Green told him about the immigration consequences before entering his plea, particularly since defendant waived his attorney-client privilege so Green could testify. There was no evidence to refute Green's extensive testimony about his conversations with defendant, that he faced grave immigration consequences if he accepted the plea, and that defendant decided not to go to trial but to take the plea offer. While defendant waived his presence at the evidentiary

hearing, there is nothing in the record to show that after the evidentiary hearing, the trial court would have denied a defense motion to continue if defendant wanted to file a supplemental declaration to address Green's testimony.

As for prejudice, even if the probation report was considered, the evidence in this case is insufficient when compared to the situations discussed in *Vivar*, *Espinoza* and *Lopez*. Defendant had been in the United States since 2007, when he was 10 years old, and became a lawful permanent resident in 2014, when he was 17 years old. He attended local schools and graduated high school, and went to a community college from 2016 to 2018. But the evidence also shows that at the time of the offenses in 2019, he was 21 years old, he was no longer attending school, and he had never been employed. While he lived with his parents and younger siblings, there is no evidence about his relationships with his family or whether he engaged in any activities in the community at large, aside from his statement in the probation report, that he usually asked people for money but did not intend to attack anyone.

Based on the record before this court, we cannot say there was sufficient evidence of defendant's ties to support his claim of prejudicial error, similar to the evidence discussed in *Vivar*, *Espinoza* and *Lopez*, that the prospect of deportation was the most important part of his decisionmaking when he was facing the criminal charges and whether to accept the plea offer or go to trial. Indeed, there is nothing in the record to show that defendant even considered his immigration status as a factor in 2019. Instead, the record shows that Green took the initiative to learn about defendant's immigration status, consulted with Castaneda, and informed defendant that he faced almost certain deportation if he accepted the plea offer. Defendant still decided to accept the plea offer despite Green's warnings and his readiness to go to trial.

We find the trial court properly denied defendant's motion to vacate his conviction.

**DISPOSITION**

The trial court's order of March 22, 2024, denying defendant's motion to withdraw his plea and vacate his conviction is affirmed.

DETJEN, J.

WE CONCUR:

LEVY, Acting P. J.

PEÑA, J.